482 S.E.2d 893

**In re JONATHAN G.**

No. 23465.

Supreme Court of Appeals of
West Virginia.

Submitted Nov. 19, 1996.

Decided Dec. 18, 1996.

720

Tracy B. Dawson, Steptoe & Johnson, Martinsburg, Guardian Ad Litem

Pamela Games–Neely, Prosecuting Attorney of Berkeley County, Martinsburg, for State of West Virginia.

Scott A. Ollar, Camiletti, Ollar & Santa Barbara, Martinsburg, for Kenneth and Patricia Stem.

Bryan Craig Manford, Martinsburg, for Johnny G.

Robert Schiavoni, Hammer, Ferretti & Schiavoni, Martinsburg, for Lisa Knighton.

Barbara L. Baxter, Assistant Attorney General, Charleston, for Department of Health and Human Services.

Jane Moran, Williamson, for Amicus Curiae.

WORKMAN, Justice:

Appellants Kenneth and Patricia Stem, as prior long-term foster parents of the infant Jonathan G.,[1] appeal from the October 23,

___

1. Consistent with our prior practice, we identify the infant and his parents by initials due to the sensitive nature of this case. *See In re Jonathon*

1995, decision [2] of the Circuit Court of Berkeley County denying them permanent visitation rights with Jonathan G. The Stems assert additional error with regard to the circuit court's failure to permit them to participate meaningfully in the termination proceedings that occurred on June 21 and 22, 1994; the circuit court's decision to return Jonathan G. to his biological parents; and the circuit court's decision to remove the West Virginia Department of Health and Human Resources ("DHHR") from this case. DHHR cross-assigns as error the circuit court's decision to return Jonathan G. to his parents, the prosecuting attorney's improper representation of DHHR, and the circuit court's removal of DHHR from the case. Upon a thorough review of this matter, we [3] affirm the circuit court's order restoring permanent custody to the natural parents, but remand this case for further proceedings to determine whether it would be in Jonathan G.'s best interest to have continued contact with the Stems.

## I. Factual and Procedural Background

Jonathan G. was born to Johnny G. and Lisa K. on April 23, 1990. While his parents are hearing impaired,[4] Jonathan G. has no hearing problems. In June of 1990, Jonathan G. suffered a spiral break of his left femur, which was subsequently determined by the treating physicians to be accidental in nature. Then on December 8, 1990, Jonathan G.'s mother took him to the emergency room for what was later diagnosed as "shaken baby syndrome." The shaking incident actually occurred a day earlier. As a result of the shaking, Jonathan suffered intercranial hemorrhaging. The severity of his injuries required immediate transfer to Johns Hopkins in Baltimore, Maryland, for treatment.

On December 19, 1990, DHHR filed an abuse and neglect petition pursuant to West Virginia Code § 49–6–1 (1996), seeking temporary custody of Jonathan G.[5] A hearing was held on the abuse and neglect petition on December 28, 1990, and the circuit court found that DHHR had demonstrated probable cause concerning the abuse of Jonathan G. The circuit court granted DHHR custody of Jonathan G. for sixty days, ordered supervised visitation for Jonathan G.'s parents, and further directed that the natural parents were to submit to psychological examinations. Through this same order,[6] the court ordered DHHR to develop a family case plan in accordance with the provisions of West Virginia Code § 49–6D–3 (1996) and to make all reasonable efforts in assisting Jonathan G. to remain in his home. The Stems, as foster parents, were awarded physical custody of Jonathan G. on December 29, 1990, when he was ten months old. Jonathan G. continued in their care and custody until September 2, 1994, when he was over four years old.

An adjudicatory hearing was held on February 19, 1991. During this hearing, the circuit court received the psychological report of Hal Slaughter. The order reflecting the findings of this proceeding states that:

> Upon motion by the State, the Counsel for the natural parents and infant child, as well as the State, agreed to stipulate that the report of Hal Slaughter was acceptable and should be entered in the record.

---

*P.*, 182 W.Va. 302, 303, 387 S.E.2d 537, 538 n. 1 (1989).

2. The order reflecting the circuit court's decision was not entered until October 2, 1996.

3. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

4. Johnny G. is completely deaf, whereas Lisa K. has 40% hearing in one ear.

5. The petition avers that DHHR believes the father of Jonathan G. was responsible for his head injuries.

6. The order reflecting the circuit court's findings at the December 28, 1990, hearing was entered *nunc pro tunc* on May 8, 1991.

The Court then notified the parties that the mother within the report had admitted that she was in fact the party who had abused the child. The mother acknowledged in the affirmative. The Court accordingly accepts the stipulation of the parties to Mr. Slaughter's report.

As a result of the adjudicatory proceeding, the circuit court concluded that Jonathan G. was an abused and neglected child; continued the custody of the infant child with DHHR; ordered DHHR to develop a family case plan; ordered supervised visitation for the natural parents; and directed that the natural parents participate in counseling programs as directed by DHHR. The order further provided that the natural parents were to be permitted to use the services of an interpreter to assist them in cooperating with the circuit court's directives.

A dispositional hearing was held on May 13, 1991, resulting in the circuit court's continuation of custody with DHHR. The circuit court again directed that the natural parents were to participate in counseling programs after finding "no improvement from the prior hearing." The circuit court further directed the child's parents to cooperate with DHHR "and with the Family Case Plan filed in this matter."

On June 11, 1992, DHHR filed a motion for termination of parental rights, asserting that the biological parents deny any abuse of Jonathan G. and that counseling has resulted in "very little progress." The petition further provides that DHHR has permitted the natural parents to have weekly visitation during the entire seventeen-month period that Jonathan G. has been in the custody of foster parents.

On July 16, 1992, the circuit court ordered Dr. Townsend, a psychologist, to perform an independent evaluation of Jonathan G. and his natural parents. On July 28, 1992, the circuit court granted the State's motion to continue the termination proceedings based on the "recent development" concerning the availability of "services that might have been provided to hearing impaired parents of hearing children which were not provided due to two opposing expert philosophies." [7]

Dr. Townsend sent the circuit court a letter dated October 9, 1992, indicating that Lisa K. "has shown progress" and referencing the viability of the improvement plan previously discussed with the court. Another letter, dated October 16, 1992, from Randy Henderson, a licensed professional counselor, sets forth that both natural parents "have shown progress in our therapy sessions." During a hearing before the circuit court on November 30, 1992, the natural parents moved for increased visitation with Jonathan G. While the circuit court denied an increase in the frequency of the visitation, it ordered that "the length of each visit should be gradually increased" and further provided for "[a]t least one unsupervised visit ... around Christmas." The circuit court ordered expanded visitation for the natural parents at a hearing on January 15, 1993. The order from this proceeding indicates that following "a two hour session between the parents, child and third party [,visitation] then shall be expanded to a two hour session twice weekly then shall be expanded to five hour sessions" and further states the court's intention "that unsupervised visitation of very short periods of time may be arranged in the future."

By January 4, 1993, Jonathan G. had been in the Stems' custody and care for more than two years, and they filed a petition seeking leave to make an appearance in these proceedings. [8] As support for their intervention, the Stems averred that DHHR "has been largely unsuccessful" in its efforts to "prevent the termination of the parental rights" and in its "effort[s] to reunify the family." The Stems stated that their intention was "to appear in a hybrid relationship of physical

7. The record does not provide any additional information regarding the nature of the two opposing philosophies referenced in this letter.

8. The Stems had previously filed a document on November 11, 1992, styled "Notice of Appearance," which indicated that Scott A. Ollar was their counsel of record.

custodian of the child and as the child's representative in loco parenti." As statutory authority for their involvement, the Stems cited West Virginia Code §§ 49–6–5 and –8 (1996).[9] After requesting briefs from the parties on the issue of the Stems' involvement in these proceedings,[10] the circuit court heard arguments concerning this issue on February 4, 1993. Finding that "there is no clear statutory provision for automatic standing of a foster family[,]" the circuit court initially denied the Stems' petition for intervention. However, by order entered July 8, 1993, the circuit court "granted [the Stems] standing in this matter, in order to present another perspective on the best interests of the minor."[11] The order granting standing expressly admonishes the Stems "that their involvement in these proceedings should not create the false impression that they have parental rights equivalent to Johnny G. or Lisa K., nor coequivalent rights of any sort with regard to Jonathan G."

On May 6th and 7th, 1993, the circuit court held a hearing on a petition filed by the natural parents, seeking a finding of contempt against DHHR.[12] The circuit court found that DHHR was "in contempt of the prior Orders of this Court regarding preparation of a case plan for the purpose of reunification[.]" The circuit court declared that DHHR "is unable to continue to manage this case objectively with a view towards possible reunification of the family herein, and accordingly must be removed as the primary case manager but should remain as a party throughout these proceedings." Responsibility for the "development and implementation of a case plan consistent with the expressed goals of reunification previously

9. West Virginia Code § 49–6–5 deals with the disposition of neglected or abused children. West Virginia Code § 49–6–8 concerns foster care review that is to be initiated by the state, and provides that the circuit court shall give notice to and permit the appearance of foster parents in such review proceedings.

10. The natural parents submitted a joint memorandum, arguing that the provisions of West Virginia Code §§ 49–6–5 and –8 provide no authority for the involvement of foster parents. They further argued that "intervention by the foster parents would compromise the ability of the State to provide a meaningful improvement period."

11. This order followed a motion for reconsideration filed by the Stems in which they informed the circuit court of this Court's holding in *Bowens v. Maynard*, 174 W.Va. 184, 324 S.E.2d 145 (1984), that "a party [that] has lawful physical custody of a child, ... has the right ... to be heard in any proceeding that concerns the child." *Id.* at 184–85, 324 S.E.2d at 145, Syl. Pt. 1, in part.

12. As grounds for their petition for contempt against DHHR, the natural parents averred, inter alia:

1. That the undisputed evidence in the instant case shows more particularly, since October, 1992, that the natural parents herein have made great improvements and advances in acquiring those skills and attributes needed to become good, caring, and nurturing parents, and although these parents may not as of yet be ready for reunification with their infant child, they have demonstrated to the Court that they have willingly cooperated with DHHR in the development of a reasonable family case plan designed to lead to reunification and that they have responded and followed through with such a plan of action and other rehabilitative efforts through social, medical, mental health and other rehabilitative agencies....

2. That the aforesaid efforts of the natural parents were not the result of any family case plan prepared or advocated by DHHR, but were the result of intervention by the Court at the insistence of their respective counsel when the Court was made aware of the underlying flaw in the manner in which DHHR was attempting to seek rehabilitation and reunification for this family, to-wit, not using counselors and personnel trained in sign and the culture of the deaf community; and that once this flaw was corrected and appropriately trained personnel and agencies intervened, great improvement was noted by both natural parents as aforesaid.

3. That as a matter of law, there exists sufficient evidence before the Court to justify a finding that "there is a reasonable likelihood that the conditions of neglect or abuse can be substantially corrected by the natural parents herein."

4. That despite such improvement by the natural parents herein, DHHR has directed a course of conduct against said parents to prevent them from engaging in any meaningful improvement period by restricting visitation between the parents and their child, and by advocating for termination of their parental

contained in the prior Orders of the Court[ ]" was delegated to an independent agency. The private agency utilized in the stead of DHHR was Action Youth Care, Inc. ("Action Youth"). The order reflecting the contempt proceedings makes it clear that while DHHR was "removed from its role as case manager," the circuit court directed that DHHR "shall remain a party to these proceedings and will be represented by counsel of its choice." [13]

On June 7, 1993, the circuit court ordered that this matter be continued for six months [14] "at which time the Court shall review the efforts of ... Action Youth Care, Inc. to determine whether or not the parents and the child can be successfully reunited or the parental rights [should be] terminated." In November 1993, the circuit court enlisted the services of Dr. Paul Kradel, as friend of the court, to perform a psychological study and family assessment of the parties. In the report dated February 3, 1994, that Dr. Kradel submitted to the circuit court, he states that Lisa K. "provided me with no definitive answer about who might have done the shaking." [15] He concluded that "it is my estimation that it will take a minimum of another three (3) years of intensive social and therapeutic services to bring the biological family to a point of skill where they can function as an independent family unit."

In the monthly progress report submitted to the circuit court by Action Youth dated March 7, 1994, the natural parents were noted to have completed their in-home preservation/reunification program as of January 17, 1994. The report further states:

Action Youth Care is of the opinion that this family is very aware of its obligation to this child and are capable of parenting this child in a safe, consistent, self-respecting, and definitely loving atmosphere. We do not suspect this child to be in any sort of physical or mental danger while in the biological home nor have we witnessed anything that would indicate otherwise.

We feel that permanency for this child is the utmost importance at this time.

On April 19, 1994, the State [16] filed a petition to terminate the parental rights of the natural parents. As grounds for its petition, the State cited the mother's denial of her earlier admission of the abuse and the lengthy period of time Dr. Kradel estimated it would take before the family could function independently. A two-day hearing was held on the State's termination motion on June 21 and 22, 1994. Before concluding the presentation of its evidence, however, the State withdrew its petition when it realized it was

rights, even in the face of the improvements aforesaid.

13. Due to the fact that DHHR and the prosecuting attorney were in disagreement regarding the issue of termination of parental rights and because the prosecuting attorney perceived the existence of a potential conflict of interest with regard to her continued representation of DHHR, see infra note 36, the prosecuting attorney requested that the Attorney General's office be involved in these proceedings to represent DHHR. An attorney from the Attorney General's office appeared at the May 7, 1993, contempt proceedings on behalf of DHHR. Even after the prosecuting attorney sought the involvement of the Attorney General because of the contempt proceedings, the prosecutor continued to appear and take an active role in these proceedings. From the contempt proceedings forward, it appears that the Attorney General's office represented DHHR and the prosecutor appeared on behalf of the State's interest. DHHR states in its brief to this Court, that "at hearings before and after the contempt hearing, the role of the prosecutor was unclear."

14. The case had been before the circuit court for more than two and one-half years at this time. We observe, additionally that it had been two years and four months since an adjudication of abuse, even though the statute in effect at that time provided that a post-adjudicatory improvement period could not exceed twelve months. See W. Va.Code § 49–6–5(c) (1992).

15. Dr. Kradel notes in his report that "[i]t is Mr. Slaughter's opinion that if [D]HHR would have built a solid treatment program based on that original confession [to him] that this matter would have been successfully resolved with the family being much closer to reunification than it is now."

16. By the State, we are referring to the prosecuting attorney. At times, the prosecutor appears to have continued to represent DHHR and at other times, the prosecutor seems to have represented her own views with regard to the issues herein.

unable to meet its burden of proof.[17] The circuit court's order reflects that "[t]he State further requested that reunification efforts continue and that within a six month time frame the infant child shall be returned to the physical custody of the biological parents" and "the plan outlined by Dr. Paul Kradle [sic] should be implemented." The order finds, inter alia, that:

1. The facts and evidence in this case are insufficient to support termination.

2. Once appropriate services were provided the family improved.

3. The safety of the child is not an issue.

4. The foster family has been a valuable resource in this case and have provided excellent care for this child.

5. The Court agrees that closure is needed.

6. The Court agrees that in six months that the child should be physically reunited with the biological parents.

On August 1, 1994, the Stems presented arguments on their Rule 60(b) motion for relief [18] from the circuit court's order entered in connection with the termination proceedings. Relying on the *Bowens* case, the Stems argued that they were denied meaningful participation at the termination proceeding. The Stems' motion was opposed by the guardian ad litem, the State, and the natural parents. After hearing arguments regarding the Stems' lack of participation at the termination proceedings,[19] the circuit court ordered the parties to submit briefs on this issue. After reconsidering this issue at a hearing on August 24, 1994, the circuit court denied the Stems' motion for relief, finding that:

the case of *Bowen[s] v. Maynard*, [174 W.Va. 184,] 324 S.E.2d 145 (W.Va.1984) is distinguishable from this case primarily due to the fact that custody was given to the Petitioner in *Bowen[s]* by the natural parents and in this case the Intervenors' [Stems'] custody was given to them by the Department of Health and Human Resources who in fact have custody and were allowed to fully participate in the hearing on June 21 and 22, 1994. . . .

At the conclusion of this same proceeding, the circuit court ordered that Jonathan G. was to be returned to his natural parents' household on September 2, 1994, and provided for the foster parents to have visitation on alternating weekends and on alternating holidays, beginning on September 9, 1994.

Although the termination proceedings had reached their conclusion on June 22, 1994, at which time the petition seeking termination was dismissed pursuant to joint motion of the State and DHHR, the circuit court continued jurisdiction in this matter "because of the special needs that are present in this case." The circuit court reviewed the status of this matter periodically.[20] By letter dated April 24, 1995, Dr. Kradel reported to the circuit court that "[f]or the most part things are going well. The biological parents have independently provided the majority of care for their son for nearly eight months with no major problems."

The final hearing held in this case occurred on October 23, 1995, at which time Jonathan G. was returned to the legal custody of his natural parents. While finding that "both biological and foster parents are 'psychological parents'" of Jonathan G., the circuit court concluded, "that it does not believe that it

17. The circuit court concurred with the State's assessment of the evidence, stating in its order that "if the State had rested its case, upon motion of any other party, a motion of directed verdict against the State would have issued."

18. The Stems sought to have the circuit court set aside its order entered in connection with the termination hearing and further sought a stay of all proceedings.

19. The record indicates that the circuit court advised the parties to confer prior to the termination proceedings for the express purpose of resolving the role that the Stems' counsel should have at the termination hearing.

20. Review hearings were held before the circuit court on September 25, 1994; November 17, 1994; April 19, 1995; and August 14, 1995.

has the authority to order visitation rights to the foster parents; however, if he had the power he would do so." The natural parents agreed to voluntary visitation, which continued until the Stems filed their petition for appeal with this Court.

## II. Discussion

### A. Procedural Delays

We face yet another case where the delays in resolving the underlying allegations of abuse, in developing an effective improvement plan, in resolving whether the family could be reunified, and in bringing permanency to this child's life are totally unacceptable. Upon reviewing another egregiously delayed abuse and neglect case chronology in *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991) we said:

> Certainly many delays are occasioned by the fact that troubled human relationships and aggravated parenting problems are not remedied overnight. The law properly recognizes that rights of natural parents enjoy a great deal of protection and that one of the primary goals of the social services network and the courts is to give aid to parents and children in an effort to reunite them.
>
> The bulk of the most aggravated procedural delays, however, are occasioned less by the complexities of mending broken people and relationships than by the tendency of these types of cases to fall through the cracks in the system. The long procedural delays in this and most other abuse and neglect cases considered by this Court in the last decade indicate that neither the lawyers nor the courts are doing an adequate job of assuring that children—the most voiceless segment of our society—aren't left to languish in a limbo-like state during a time most crucial to their human development.

*Id.* at 623, 408 S.E.2d at 375.

Since the *Carlita B.* case in 1991, this Court has consistently urged the circuit courts that they must accord abuse and ne-glect cases the highest priority and must not let them languish during the critical formative years in a child's life. We emphasized this point again in *State ex rel. Amy M. v. Kaufman,* 196 W.Va. 251, 470 S.E.2d 205 (1996), while recognizing how difficult it can be for courts to appreciate that the time is ripe for decision:

> A circuit judge overseeing a case such as this has an immensely difficult task, for in many abuse and neglect cases there is a genuine emotional bond as well as the natural biological bond between parent and child which courts are understandably hesitant to break if there is hope of meaningful change. In most abuse and neglect cases, the parent(s) may have redeeming qualities that create such hope that they will be able to make the necessary changes to become adequate parents.
>
> . . . .
>
> Although it is sometimes a difficult task, the trial court must accept the fact that the statutory limits on improvement periods (as well as our case law limiting the right to improvement periods) dictate that there comes a time for decision, because a child deserves resolution and permanency in his or her life, and because part of that permanency must include at minimum a right to rely on his or her caretakers to be there to provide the basic nurturance of life.

*Id.* at 260, 470 S.E.2d at 214.

Despite this Court's emphasis on the level of attention that should be given to abuse and neglect cases, lawyers and judges continue to allow these cases to lag on without prompt resolution. While blame for the delays experienced in the instant case can be assessed against various entities, our goal is not to point the finger of fault but to seek once again to capture the circuit courts' attention on this issue. Hopefully, this Court's adoption of the new Rules of Procedure for Abuse and Neglect Proceedings, on December 5, 1996, will create progress in this very difficult arena.

### B. Role of Foster Parents at Termination Proceeding

The Stems argue that they were denied the right to meaningful participation at

the termination hearing. Their counsel was permitted to be present, but was not permitted to present or cross-examine witnesses.[21]

This Court recognized in syllabus point one of *Bowens* that "[i]f a party has lawful physical custody of a child, she has the right to service of process and to be heard in any proceeding that concerns the child." 174 W.Va. at 184–85, 324 S.E.2d at 145. We further held that "[i]f a party having lawful physical custody of a child is not served with process of a proceeding concerning that child she has the right to intervene in that proceeding." *Id.* In that case, we determined that an individual who had been granted physical custody of the children by written agreement of the natural mother prior to the initiation of abuse and neglect proceedings was entitled to notice of the proceedings pursuant to West Virginia Code § 49–6–2(c) and was wrongly denied the right to intervene in the abuse proceedings. In deciding *Bowens,* the Court first looked to the definition of custodian found in West Virginia Code § 49–1–5(5) (1981)[22] which provides that " '[c]ustodian' means a person who has or shares actual physical possession or care and custody of a child, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceedings[.]" This Court then examined the language of West Virginia Code § 49–6–2(c) (1984),[23] which stated that "[i]n any proceeding under this article, the party or parties having custody of the child shall be afforded a meaningful opportunity to be

heard, including the opportunity to testify and to present and cross-examine witnesses."

■ In denying the Stems' motion for relief, the circuit court reasoned that the involvement of DHHR, as Jonathan G.'s custodian, precluded the applicability of the *Bowens* ruling. While DHHR was clearly the legal custodian of Jonathan G.; however, it was not his physical custodian. Thus, the circuit court's attempt to distinguish *Bowens* from the present case on that basis does not survive scrutiny under the statutory definition of custodian. *See* W. Va.Code § 49–1–5(5). *Bowens,* however, was decided in the factual context of an individual who was a lawful custodian *prior* to the initiation of abuse and neglect proceedings, which clearly is the type of custodian contemplated by the provisions of West Virginia Code § 49–6–2(c). The more difficult issue that we face here is whether foster parents enjoy the statutory rights of notice and participation extended by West Virginia Code § 49–6–2(c) when their status as a child's custodian results from the filing of abuse and neglect charges and exists subject to and under the auspices of the DHHR's role as the child's legal custodian. An examination of the law of other jurisdictions is helpful.

The Court of Appeals of Minnesota determined in *In re Welfare of C.J.,* 481 N.W.2d 861 (Minn.App.1992), that because the statutory definition of custodian[24] included foster parents, the foster parents involved in that

---

21. The circuit court did permit the Stems' counsel to state his position with regard to effecting the reunification of Jonathan G. with his natural parents and also with regard to immediate removal of Jonathan G. from the Stems following the termination hearing. *See infra* note 32.

22. The current statutory definition of "custodian" is identical to the one set forth in the 1981 statute relied upon in *Bowens. See* 174 W.Va. at 186, 324 S.E.2d at 147; *cf.* W.Va.Code § 49–1–5(5) (1996).

23. The current version of this statute reads: "In any proceeding pursuant to the provisions of this

article, the party or parties having custodial or other parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses." W. Va.Code § 49–6–2(c) (1996).

24. Custodian was defined under Minnesota law as " 'any person who is under a legal obligation to provide care and support for a minor or who is in fact providing care and support for a minor.' " *In re C.J.,* 481 N.W.2d at 863 (quoting Minn.Stat. § 260.015, subd. 14 (1990)).

case were permitted to intervene under Minnesota's statutory language which parallels that of West Virginia Code § 49–6–2(c).[25] 481 N.W.2d at 862–63. The Minnesota court expressly rejected the argument that the foster parents are merely agents for the county and therefore cannot intervene as of right. The court held: "The intervention statute, however, does not require a party have legal custody; instead the party must only be a lawful custodian. Here the foster parents fall under the definition of custodian and therefore they have the right to participate in the termination proceedings." *Id.* at 863. Like the Minnesota court, we conclude that the absence of a statutory provision requiring that only legal custodians have a right to participate in termination proceedings negates the argument that DHHR's involvement, as the child's legal custodian, is all that is authorized by West Virginia Code § 49–6–2(c).

Numerous tribunals have permitted foster parents to intervene and participate in at least part of the termination proceedings, depending on applicable statutory provisions. *See Custody of a Minor*, 13 Mass.App.Ct. 290, 432 N.E.2d 546, 554 (1982) (finding no error in trial court's decision to permit foster parent involvement in termination proceedings despite lack of constitutional right to such participation); *In re Kimberly J.*, 191 A.D.2d 984, 595 N.Y.S.2d 146 (1993) (holding that foster parents had no statutory right to intervene in factfinding stage of termination proceedings, but did have right to intervene in dispositional phase of proceeding given

custody nature of proceeding); *In re Baby Boy Scearce*, 81 N.C.App. 531, 345 S.E.2d 404, 410 (1986) (discussing statutory right of foster parents to participate in review proceedings concerning child's placement after termination of parental rights and noting "[a]t the very least, foster parents have the right for an opportunity to be heard, a right which derives from the child's right to have his or her best interests protected"); *see also Berhow v. Crow*, 423 So.2d 371 (Fla.Dist.Ct. 1982) (finding that foster parents had liberty interest arising from relationship with child that entitled them to notice and meaningful opportunity to be heard in adoption proceedings).

Many of those courts that permit foster parents to participate in termination proceedings recognize a need to limit the scope of their involvement in such proceedings. In *In re D–L–C.*, 834 S.W.2d 760 (Mo.Ct.App. 1992), the appellate court held that the foster parents' participation in everything but name in a parental rights termination proceeding was reversible error.[26] *Id.* at 768. Rather than relying on language within a termination statute as grounds for participation, however, the foster parents in *D–L–C.* looked to the provisions of a foster parent statute which permitted them "to present evidence for the consideration of the court."[27] 834 S.W.2d at 767 (quoting 1985 Mo. Laws § 211.464). In castigating the full-blown participation of the foster parents in the termination proceeding, the Missouri appellate court cited the United States Supreme Court's observation in *Santosky v. Kramer*,

25. The Minnesota statute delineating who has the right to participate in termination proceedings provided: "A child who is the subject of a petition, and the parents, guardian, or lawful custodian of the child have the right to participate in all proceedings on a petition." *In re C.J.*, 481 N.W.2d at 863 (quoting Minn.Stat. § 260.155, subd. 1a (1987)).

26. The foster parents participated through counsel, as though a party to the proceedings, and "[t]he trial court did not confine Hickle's [their counsel's] role to presenting evidence relevant to the termination issue." 834 S.W.2d at 768. The foster parents' counsel presented evidence of their education and their affection for the child, which evidence, the appellate court stated, "had

nothing to do with whether one or more grounds existed for termination of ... parental rights...." *Id.*

27. The statute, in its entirety, states:

Where a child has been placed with a foster parent, with relatives or with other persons who are able and willing to permanently integrate the child into the family by adoption, if the court finds that it is in the best interests of the child, the court may provide the opportunity for such foster parent, relative or other person to present evidence for the consideration of the court.

1985 Mo. Laws § 211.464.

455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), that: " 'However substantial the foster parents' interests may be, they are not implicated directly in the factfinding stage of a state-initiated permanent neglect proceeding against the natural parents.' " 834 S.W.2d at 767 (quoting *Santosky*, 455 U.S. at 761, 102 S.Ct. at 1399 and citation omitted).

In the instant case, it is difficult not to be sympathetic to the Stems' effort to participate, not only because they had Jonathan G. with them for so long, providing him with love, constancy, and care in his earliest years; but also because the significant issues relating to a child's life and fate must not be decided in some artificial procedural vacuum, and the Stems, after the passage of so much time, probably were more knowledgeable than anyone as to this child's needs. What makes balancing their right to participate, and the extent of such participation, against the natural rights of the biological parents, as well as the statutory objective of reunifying Jonathan G. with them, so difficult is that both sets of parents, foster and biological, obviously loved and wanted this child. As a result of this love, and their strong commitment to this child, the two sets of parents became adversaries during these proceedings. As an aside, we must comment that scenarios such as the one before us would discourage most people from ever embarking on the noble work of foster care. Since the Stems were a constant in Jonathan G.'s life for such a long period of time and during his formative years, it would seem to go against not only all principles of fairness and equity, but also against all values of human relationship and compassion to deny them the right to be heard as to Jonathan G.'s best interests during these proceedings.

■ While we recognize that the statutory language of West Virginia Code § 49–6–2(c), when viewed in conjunction with the *Bowens* case, certainly appears to afford foster parents a right to participate in abuse

and neglect proceedings, we believe sound public policy and the overall purposes of both statutory and case law regarding abuse and neglect proceedings dictate that such participation have its limits. Perhaps the healthiest balance we can achieve is to hold that the foster parents' involvement in abuse and neglect proceedings should be separate and distinct from the fact-finding portion of the termination proceeding and should be structured for the purpose of providing the circuit court with all pertinent information regarding the child. The level and type of participation in such cases is left to the sound discretion of the circuit court with due consideration of the length of time the child has been cared for by the foster parents and the relationship that has developed. To the extent that this holding is inconsistent with *Bowens v. Maynard*, 174 W.Va. 184, 324 S.E.2d 145 (1984), that decision is hereby modified. When foster parents are involved in these proceedings, however, the circuit court must assure that the proceeding does not evolve into a comparison of the relative fitness of the foster parents versus the biological parents.[28] See *In re Trapp*, 593 S.W.2d 193, 205–06 (Mo.1980), *appeal dismissed*, 456 U.S. 967, 102 S.Ct. 2226, 72 L.Ed.2d 840 (1982) (overruling trial court's granting of foster parents' motion to intervene in neglect proceedings, noting that foster parents' presence would "interject the false issue of the fitness of the foster parents to have custody of the children" and observing that children cannot be removed from their parents on grounds that they would be "better off" in another home).

We do not reverse the circuit court on this issue of denial of meaningful participation, but direct that on remand the Stems should be given a full opportunity to be heard concerning Jonathan G.'s interests and their desire to have a continued relationship with him.

---

**28.** The natural parents in this case aver that they were improperly and unknowingly sent to a psychologist, whose report was then used to compare them to the foster parents.

## C. Failure to Terminate Parental Rights

██ Both the Stems and DHHR[29] argue that the circuit court erred by not terminating the parental rights of the natural parents. In support of this assignment, these parties cite in *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993), in which we held that:

Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.

*Id.* at 25–26, 435 S.E.2d at 163–64, Syl. Pt. 3. They question whether Lisa K. properly acknowledged that she committed an abusive act towards Jonathan G. The record reveals that during the adjudicatory hearing on February 19, 1991, the circuit court expressly incorporated the report of the psychologist, Hal Slaughter, to whom Lisa K. admitted that she had committed the act resulting in Jonathan G.'s "shaken baby" diagnosis. The circuit court's order further states "[t]he mother acknowledged in the affirmative." While it is somewhat unclear from this language whether the circuit court was referencing an in-court affirmation by Lisa K. regarding the act of abuse, nonetheless, the parties stipulated to the admission of Mr. Slaughter's report which contained the admission of abuse.

The facts of this case simply are not the equivalent of those present in *In re Jeffrey*

R.L. While Lisa K. did vacillate when subsequently questioned regarding the act of abuse during therapy, Dr. Kradel suggests an explanation in his report of February 3, 1994: "In some instances individuals have emotional blockages where traumatic experiences are removed from conscious awareness and they truly do not remember what has happened to them or what they have done." Another explanation provided by the signing counselors, according to the prosecutor's brief, is that "the mother could no longer recount the abuse ... because in therapy they had moved beyond that point and progressed toward positive interaction with the child." While Lisa K. may have shown some ambivalence about her earlier admission of abuse,[30] the original acknowledgment was nonetheless made.[31] Moreover, both the natural parents cooperated with therapeutic intervention, that was ultimately deemed beneficial.

The termination proceedings ended on the State's motion to withdraw the petition with DHHR joining in this decision. We find no abuse of discretion regarding the circuit court's granting of that motion based on its finding that the evidence presented at that time was not sufficient to justify termination. Apparently, the circuit court, the State, and DHHR all agreed that the evidence, at this time, did not support a finding that the conditions that led to the abuse could not be substantially corrected. The record reveals that the guardian ad litem had no objection to the withdrawal of the termination petition.[32]

## D. Removal of DHHR

While DHHR argues that it was removed from this case by virtue of the circuit court's

---

29. Since it joined in the State's motion to withdraw the termination petition, we find the DHHR's assertion of this assignment of error to be without a proper procedural basis.

30. It is well-documented that where there is no acknowledgement of abuse nor an acknowledgement of a failure to protect, it generally does not bode well for future improvement from a therapeutic perspective.

31. We observe additionally that Dr. Kradel, in his February 3, 1994, report, refers to an interview with psychologist Stephen Townsend on January 24, 1994, during which Mr. Townsend

told Dr. Kradel "that Lisa had 'signed' to him that she shook the baby."

32. The only concerns raised by the guardian ad litem pertained to his concurrence with the recommendation of Dr. Kradel and Mr. Henderson that Jonathan G. be removed from the Stems and placed in another foster home with individuals trained in signing and that the reunification efforts be expedited. While there was discussion at the conclusion of the termination proceedings regarding the removal of Jonathan G. from the Stems, this removal was apparently never effectuated.

ruling during the May 6–7, 1993, contempt proceedings, a careful review of the record does not support this position. The circuit court removed DHHR as the case manager due to its conclusion that DHHR was "in contempt of the prior Orders regarding preparation of a case plan for the purpose of reunification." The order entered in connection with this proceeding states clearly that DHHR "should remain as a party throughout these proceedings."

 The circuit court apparently felt that it had no choice but to involve an independent agency like Action Youth, given DHHR's failure to obey the circuit court's repeated directive to develop and follow a case plan for the purpose of reunifying Jonathan G. with his natural parents. DHHR, as a party to this case (usually by its agent, an individual child protective services worker), has the right and responsibility to advocate whatever position it determines proper under the law and in the best interests of the child. However, DHHR also has the duty to follow the court's directives in working on the case from the perspective of the delivery of social services. In a case, such as this, where DHHR refuses to comply with court directives, a circuit court may appoint an agency independent of DHHR to assist in case management. DHHR, however, as the circuit court clearly recognized by virtue of its directive that DHHR remain a party, was not absolved of its statutory duties to Jonathan G. despite its removal as the case manager.

### E. Role of Prosecuting Attorney

The duties of the prosecuting attorney in regard to prosecution of abuse and neglect proceedings are set forth in West Virginia Code § 49–6–10 (1996):

> The guardian ad litem's position with regard to this appeal is that the identity of Jonathan G.'s perpetrator of harm was identified and as such, cannot be relied upon as the basis for reversing the termination proceeding. Furthermore, the guardian ad litem observes that the Stems assented to the return of Jonathan G. to his natural parents during the October 23, 1995, hearing, stating that they were only seeking visitation

It shall be the duty of every prosecuting attorney to fully and promptly cooperate with persons seeking to apply for relief under the provisions of this article in all cases of suspected child abuse and neglect, to promptly prepare applications and petitions for relief requested by such persons, to investigate reported cases of suspected child abuse and neglect for possible criminal activity and to report at least annually to the grand jury regarding the discharge of his or her duties with respect thereto.

In the amicus brief submitted in this case by Jane Moran, she states that "[t]he relationship between the DHHR and the Prosecuting Attorney ... appears to have been mutually supportive from the original taking of Jonathan in December, 1990 through July 1992." Ms. Moran suggests that the problem began when the prosecutor sought a continuance on the grounds that "'there are services that might have been provided to hearing impaired parents of hearing children which were not provided due to two opposing expert philosophies.'" Apparently, there was a meeting between the prosecutor and the foster care workers and assigned supervisor on January 25, 1993, during which it became apparent that the prosecutor did not support DHHR's decision to seek a termination of parental rights.

The record, as well as the oral arguments presented in this case, evidence that vitriolic discord existed between DHHR and the prosecuting attorney, all of which stemmed from a difference in views regarding the resolution of this matter. The prosecutor apparently believed that reunification was possible, whereas DHHR fervently believed that termination of parental rights was in Jonathan G.'s best interests.[33] Herein lies the problem. Should the role of the prosecu-

rights. With regard to visitation rights, the guardian ad litem takes the position that the Stems do not have standing to seek such rights.

**33.** To be fair to the prosecuting attorney, she did proceed to draft and file a petition for termination, even when she thought that reunification efforts had not been fully and properly attempted by DHHR. Moreover, she, along with counsel

tor be comparable to her role in criminal proceedings, requiring her to independently weigh the evidence before proceeding on a complaint, or should it be that of a traditional lawyer/client relationship, requiring her to present evidence in accord with the client's wishes within the confines of the law?

 Guidance on this issue is provided by West Virginia Code § 49-7-26 (1996), which states that "[t]he prosecuting attorney shall render to the state department of welfare [division of human services], without additional compensation, such legal services as the department may require." This statutory provision supports the view that the prosecuting attorney stands in the traditional role of a lawyer when representing DHHR in connection with abuse and neglect proceedings. Indeed, the prosecuting attorney cites no authority to the contrary. In the analogous decision of *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982), this Court held that "[t]he Legislature has thus created a traditional attorney-client relationship between the Attorney General and the state officers he is required to represent." *Id.* at

790, 296 S.E.2d at 920. Based on our conclusion that the prosecuting attorney's role as related to DHHR in an abuse and neglect proceeding is that of a traditional attorney-client, we further determine that a prosecuting attorney has no independent right to formulate and advocate positions separate from its client in these cases.[34]

This case presents a difficult and confusing scenario regarding the prosecuting attorney's role.[35] According to the amicus brief, the prosecutor advised the circuit court following the filing of the contempt petition by the natural parents against DHHR that she had a conflict in representing her client in the contempt proceedings, but would not withdraw "from any other part of this case." The Attorney General was brought into the case at the prosecutor's request[36] and upon the circuit court's direction.[37] Although the prosecuting attorney had a questionable role in these proceedings, the representations in her brief illustrate the difficulties encountered by the prosecutor in connection with her representation of DHHR.[38]

 Jane Moran, as amicus curiae, suggests that DHHR was prevented by the

---

from the Attorney General's office, sought a termination of parental rights during the two-day hearing that occurred on June 21 and 22, 1994.

**34.** While *Manchin* supports the prosecutor's role in terms of a traditional lawyer/client relationship, we acknowledged that the Attorney General, as discussed in that decision, has no law enforcement powers. *Id.* at 787, 296 S.E.2d at 917. In contrast, the prosecutor clearly has law enforcement powers. Moreover, the same statute that directs the prosecutor to assist in the prosecution of child abuse and neglect laws also authorizes the prosecutor "to investigate reported cases of suspected child abuse and neglect for possible criminal activity." W. Va.Code § 49-6-10. These investigatory and enforcement rights are clearly outside the scope of the traditional lawyer/client relationship. Thus, the prosecutor, unlike the Attorney General, clearly has a dual role in the area of civil/criminal abuse and neglect cases that requires him or her to provide representation to those seeking to file child abuse and neglect complaints and also to investigate and enforce child abuse and neglect laws of this State. Thus, the prosecutor's authority is more limited by the client's position within the civil arena of abuse and neglect proceedings as compared to the criminal side of such proceedings.

**35.** Indeed, the prosecuting attorney stated at the oral argument of this case that she had no client

and was appearing in connection with DHHR's allegations in its brief concerning her commission of unethical conduct.

**36.** Among additional reasons cited by the prosecutor for the involvement of the Attorney General was a potential conflict of interest in the event criminal contempt proceedings were brought against DHHR, and violation of Rules 1.2(d) and 1.6(b) of the Rules of Professional Responsibility. Given the parameters of this appeal, we do not further discuss the ethical concerns raised in conjunction with the prosecutor's representation of DHHR.

**37.** The circuit court ordered that the petition for contempt be sent to the office of the Attorney General for assignment of counsel.

**38.** Among the problems the prosecutor encountered was the discovery that, while DHHR represented to the circuit court that it was providing the natural parents with appropriate counseling services, the services were often rendered inadequate because considerations necessary for providing effective services to the hearing impaired, such as interpreters and special technological devices, were either not consistently provided or were not being utilized. The prosecutor, in her brief, states:

What was very troubling to the State at the time and remains so today is that the Romney

actions of the prosecutor from presenting its point of view to the circuit court. We do not find that to be the case. While DHHR has a right to determine and advocate a position that comports with its statutory responsibilities, it must nonetheless follow the court's directives even if such directives conflict with its position. All the orders clearly reflect the circuit court's awareness of DHHR's view towards termination rather than reunification. In addition, DHHR had the benefit of the Attorney General's counsel. Upon review, we find the Department was not restricted from full participation in the proceedings, but only in its management of the case. Although the prosecutor's role in this case appears to have exceeded the boundaries of a traditional lawyer/client relationship, we find no reversible error with regard to the prosecutor's involvement in these proceedings under the facts of this case. *See infra* note 38.

### F. Failure to Develop Case Plan

The circuit court's orders are replete with directives to DHHR to develop a case plan. Yet, we cannot determine from a review of the record whether such a plan was ever developed and submitted to the circuit court. DHHR is statutorily obligated by West Virginia Code § 49–6–5 (1996) to prepare the case plan immediately after a child is adjudicated as abused or neglected.[39] Since this Court's decision in *Carlita B.*, we

have repeatedly admonished lawyers and the circuit courts regarding the critical need for prompt resolution of child abuse and neglect proceedings, as well as the importance of a promptly prepared and thorough case plan geared toward meaningful improvement and reunification. We recognized in *Carlita B.*, that

1. Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security....

3. "Under W. Va.Code, 49–6–2(b) (1984), when an improvement period is authorized, then the court by order shall require the Department of Human Services to prepare a family case plan pursuant to W. Va.Code, 49–6D–3 (1984)." Syl. Pt. 3, *State ex rel. West Virginia Dept. of Human Serv. v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987).

4. In formulating the improvement period and family case plans, courts and social service workers should cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents. The formulation of the improvement period and family case plans should therefore be a consolidated, multi-disciplinary effort

---

School for the Deaf is the state facility for deaf persons. It is where these parents were educated. For the Department not to know about specialized signing services that could have helped this family earlier is incomprehensible. Departmental workers claimed that they looked for deaf services in this area and found none. But within an approximate twenty-five mile radius of Berkeley County there exist more than twenty agencies and programs who directly deal with deaf parents who need the skills that the Circuit Court ordered.

The prosecutor states additionally that DHHR "refused to accept the progress reports of the signing counselors" and that "[t]here is some indication that they [DHHR] were not paying the bills of these counselors."

The prosecutor further indicates that upon her review of records and communication with service providers, she discovered facts that differed greatly from what she was being told by DHHR.

She learned that Jonathan G. "was not being taught to communicate with his parents, especially his father as ordered by the Court." She discovered that with regard to the natural parents' visitation, the foster parents were being given priority as to the time periods they were permitted to spend with Jonathan G. Yet another discovery was that the Stems maintain they had been promised from almost the time of placement that Jonathan G. would be eligible for adoption by them. In addition, the prosecutor states she learned "that if certain witnesses were called to the witness stand, that they might commit perjury to further the case."

**39.** Case plans can also be required by a circuit court in the pre-adjudicatory phase pursuant to West Virginia Code § 49–6–2(b), when an improvement period is granted.

among the court system, the parents, attorneys, social service agencies, and any other helping personnel involved in assisting the family.

5. The clear import of the statute [West Virginia Code § 49–6–2(d) ] is that matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible.

6. At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

185 W.Va. at 615–16, 408 S.E.2d at 367–68, Syl. Pts. 1, in part, 3–6.

■■■ While this case presents an unusual scenario in that DHHR was ordered removed as the case manager and Action Youth appointed in its stead, the obligation to prepare a case plan was initially imposed on DHHR at the conclusion of the adjudicatory hearing on February 19, 1991, when the circuit court expressly ordered DHHR to develop a family case. DHHR remained as the case manager in this case until May 7, 1993, when the circuit court removed it from such role, due to DHHR's failure to comply with the court's directives regarding "the preparation of a case plan for the purpose of reunification." For more than two years before its removal as case manager, DHHR was obligated to prepare a case plan. Because the circuit court makes several references to requiring DHHR to update its case plan, case plans may have been submitted to the trial court, and just not filed as a matter of record.[40] However, given the circuit court's complete dissatisfaction with DHHR regarding its fail-

ure to submit a case plan dealing with reunification, we can only conclude that the plans submitted by DHHR either did not comply with the statutory requirements of West Virginia Code § 49–6–5 and/or the court's directives, or that DHHR's execution of the case plan was determined by the circuit court to be inadequate. Even after Action Youth was assigned the role of case manager, we believe that DHHR nonetheless retained its statutory responsibility with regard to the filing of a case plan with the court under West Virginia Code § 49–6–5.

■■■ To be very clear, the position of DHHR that the parental rights should have been terminated is not without merit. Jonathan was a victim of shaken baby syndrome, which has frequently been the cause of serious permanent injury, or even death, of infants. Once the court made the determination that reunification was the goal, however, DHHR should have worked diligently to accomplish that goal, or filed a petition for a writ of prohibition if it believed the record justified it. See Syl. Pt. 2, Amy M., 196 W.Va. at 253, 470 S.E.2d at 207 (holding that prohibition was available to restrain courts from granting improvement periods of greater extent and duration than permitted statutorily); see also State ex rel. West Virginia Dep't of Health and Human Resources, 185 W.Va. 318, 406 S.E.2d 749 (1991) (granting writ of prohibition to DHHR to prevent enforcement of circuit court order directing blood testing seven years after jury determination of paternity).

### G. Visitation Rights

■■■ The circuit court incorrectly determined that it had no basis upon which to order continued association between the foster parents and Jonathan G. Beginning with this Court's decision in Honaker v. Burnside, 182 W.Va. 448, 388 S.E.2d 322 (1989), we have recognized the need to consider whether a child, whose custodial arrangements are being altered, should be permitted to have continued contact with individuals with whom

---

**40.** In reviewing the record, Dr. Kradel's notes also refer to numerous DHHR service plans.

an emotional bond has been formed. In that case, we held that the circuit court should provide for visitation rights between a child and her stepfather and half-brother. *Id.* at 452, 388 S.E.2d at 326. Later in *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991), an abuse and neglect case resulting in termination of parental rights, we held:

It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

In cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.

*Id.* at 649, 408 S.E.2d at 401, Syl. Pts. 3, 4.

More recently in *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995), we recognized that visitation rights may be afforded in some circumstances to a parent who is found to have abused the child, even though his parental rights have been terminated:

When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visi-

tation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

*Id.* at 448, 460 S.E.2d at 694, Syl. Pt. 5.

The guiding principle relied upon by this Court in recommending consideration of continued contact with a child is whether a strong emotional bond exists between the child and an individual such that cessation in contact might be harmful to the child, both in its transitory period of adjusting to a new custodial arrangement and in its long-term emotional development. We find no reason to except individuals, like the Stems, who have had a successful long-term relationship with a foster child and have been found, in fact, to be psychological parents to Jonathan G., from consideration for such continued association.

The court in *In re Custody of H.S.H.K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995), *cert. denied sub nom. Knott v. Holtzman*, — U.S. —, 116 S.Ct. 475, 133 L.Ed.2d 404 (1995), observed that while "[t]here is little uniformity in the case law concerning nonparental visitation over the objection of a biological or adoptive parent, ... some courts have observed a judicial trend toward considering or allowing visitation to nonparents who have a parent-like relationship with the child if visitation would be in the best interest of the child." *Id.* 533 N.W.2d at 435, n. 37 and cases cited therein. The trial court was held to have abused its discretion in denying visitation rights to the foster parents where a foster family had been the custodial family since birth of a five-year-old child. *In re Ashley K.*, 212 Ill.App.3d 849, 156 Ill.Dec. 925, 571 N.E.2d 905 (1991). The court upheld the trial court's decision to grant visitation rights to the non-successful adoptive foster parents in *In re Adoption of Francisco A.*, 116 N.M. 708, 866 P.2d 1175 (App., 1993), relying on the best interests of the child standard. The court recognized that such visitation rights may be reconsidered "[i]f at some time the visitation is no longer in the child's best interests." *Id.* 866 P.2d at 1181; *see also In re John T.*, 4 Neb.App. 79, 538

N.W.2d 761, 772 (1995) (refusing to remove child from foster parent who had AIDS, observing that lack of biological connection between foster parent and child was inconsequential in assessing child's best interests); *Sorensen v. Sorensen,* 138 Or.App. 80, 906 P.2d 838 (1995) (applying statute that permits any person including a foster parent "who has established emotional ties creating a child-parent relationship" to petition court for visitation rights).

Based on the principle of a child's right to continued association previously enunciated by this Court, we hold that a child has a right to continued association with individuals with whom he has formed a close emotional bond,[41] including foster parents, provided that a determination is made that such continued contact is in the best interests of the child. Accordingly, we remand this matter for further proceedings to determine whether continued contact with the Stems would be in Jonathan G.'s best interest. Due to the lengthy period of time that Jonathan G. has now resided exclusively in the home of his natural parents, the assessment of such continued contact may be different from what it might have been immediately following the transfer of physical custody.

Based on the foregoing, the decision of the Circuit Court of Berkeley County is remanded for further proceedings to consider whether continued association between Jonathan G. and his former foster parents is in his best interests.

Remanded.

RECHT, Judge, sitting by temporary assignment.

---

**41.** The length of time that the child has remained with the foster parents is a significant factor to consider in determining this issue.