509 S.E.2d 875

**In re HARLEY C.**

**No. 25160.**

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 9, 1998.

Decided Nov. 23, 1998.

James M. Pool, Esq., Clarksburg, Guardian ad Litem.

Natalie J. Sal, Esq., Morgantown, for Keith & Kathleen S.

Darrell V. McGraw, Jr., Esq., Attorney General, Barbara L. Baxter, Esq., Assistant Attorney General, Charleston, for WVDH & HR.

Thomas G. Dyer, Esq., Clarksburg, for Mary Lee C., mother.

Debra V. Chafin, Esq., Clarksburg, for Kenneth L., father.

Jane Moran, Esq., Williamson, for Amicus Curiae, Jane Moran.

MAYNARD, Justice:

Appellants, Keith and Kathleen St. Clair, as foster parents of the infant Harley C., appeal the order of the Circuit Court of Harrison County, West Virginia, which dismissed the petition filed in this matter and returned the infant to his biological parents. The St. Clairs contend the circuit court erred in failing to adjudicate Harley C. as an abused child; in failing to terminate the parental rights of the biological parents; and in failing to revoke the pre-adjudicatory improvement period. Upon a thorough review of this matter, we believe Harley C. is an abused child and the circuit court erred in failing to terminate parental rights. The circuit court's order which restored permanent custody to the biological parents is reversed.

Harley C. was born prematurely by caesarean section on February 8, 1997 and spent the first month of his life in the hospital. Due to concerns about bonding, especially with his mother, and the health and safety of the child, social services were provided to the parents, some of which continued until the date of the injury described below. Home health nursing services and basic parenting services, such as bathing, diaper changing, and feeding schedules, had also been provided to the parents.

Harley C. was injured on July 9, 1997, when he was five months old. Harley was taken to Ruby Memorial Hospital where he was diagnosed with a rotational fracture of the femur. He underwent a full skeletal x-ray, known as a "baby gram," which revealed a healing broken eighth rib and possibly a healing broken ninth rib on the right side. The infant was placed in a body cast. A referral was made to the Department of Health and Human Resources (DHHR) for suspected child abuse.

Harrison County Deputy Sheriff Albert Marano, with the assistance of Jennifer Gray, a child protective service worker for DHHR,

took a statement from Mary C., Harley's mother. In her statement, Mary C. denied Harley had been injured in the past. Her only explanation for the broken rib(s) was that the fracture(s) might have occurred during birth. When questioned about the fracture to his leg, Mary C. reported that the infant had been lying on the couch with pillows above his head and below his feet when she left the living room to go to the bathroom. She stated that she heard Harley scream, and when she went to investigate, he was lying on the floor on his right side.[1] She also stated the couch that Harley fell from was about eighteen inches high, and the fall caused the fracture to his leg. Mary C. said she and her mother took Harley to the doctor in Bridgeport who told them Harley would have to go to the hospital in Morgantown. Kenneth L., Harley's father, was working that day. On the way to Morgantown, Mary C. and her mother stopped to pick up Kenneth L., so he could travel to Morgantown with them.

Kenneth L. also gave a statement to Deputy Marano and Jennifer Gray. He stated he was not home when Harley was injured. However, he supported Mary C.'s version of events. Kenneth L. denied that Harley had been hurt before.

The Ruby Memorial Hospital Emergency Department Record lists the diagnostic impression of Harley as: "(1) Right femur fracture; (2) Suspicion of child abuse; (3) Diaper rash." Dr. Murphy, a radiologist, was consulted by the Pediatrics Department concerning Harley's fracture. Dr. Murphy characterized the fracture as a "rotational injury" and added, "The issue of abuse in such a fracture must be addressed. . . . I would place child in protective custody until issue resolved."

Harley improved and was discharged from the hospital on July 11, 1997. However, based on the information provided to DHHR regarding Harley's injury, on July 15, 1997, DHHR filed a petition in circuit court alleging Harley was an abused child. Harley was immediately removed from his parents' home and placed in foster care with the St. Clairs, the appellants in this case.

The court held a preliminary hearing on July 25, 1997. Jennifer Gray and several doctors who had treated Harley testified at the hearing. Dr. Cathy Jones, Harley's pediatrician, testified that she saw Harley in her office on July 3, 1997. At that time she was concerned about bonding and growth issues. She testified that she called Child Protective Services (CPS) to express her concerns and to inquire as to whether Harley was being followed by the agency. She was assured Harley was being actively followed. Dr. Jones testified that the child was next seen in her office by her partner, Dr. Cogar, on July 9, 1997, the day Harley's leg was fractured. The parents were told their child could not be treated in the office and they opted to take Harley to Ruby Memorial Hospital in Morgantown. Dr. Jones testified that Dr. Cogar was suspicious of abuse and called DHHR to report her concerns. On cross-examination, Dr. Jones testified that the radiologist who reviewed Harley's x-ray called to inform her the x-ray indicated a rotational fracture. Dr. Jones stated that this immobile five-month old had his leg twisted until it broke. She explained that her recommendation was not to send the child home because he would be at greater risk now. He was in a cast from his waist to his toes with a femur fracture, he would not feel well and would cry, and she already had reservations about Harley's growth and the parenting skills of the biological parents.

Dr. Leah Rene Urbanosky, a resident in orthopedic surgery at Ruby Memorial Hospital, also testified at the preliminary hearing. Dr. Urbanosky testified that Harley was admitted to the hospital with a femur fracture of the right leg. The child was placed in a cast in the operating room under anesthesia. Dr. Urbanosky stated that Harley underwent a baby gram or full skeletal x-ray which showed an old healing fracture of the eighth rib and possibly the ninth rib on the right side. She stated that rib fractures during birth are uncommon, "probably one of the least common things because of the chest,

---

1. We note that interestingly enough, the excuses offered for the injuries in this case are the very excuses offered by the parents in *Matter of Taylor B.*, 201 W.Va. 60, 491 S.E.2d 607 (1997).

the rib cage is so mobile." She also testified that if Harley suffered from an abnormality which caused his bones to break more easily than a normal child, the abnormality probably would have been diagnosed at birth. When asked if children of this age commonly suffer femur fractures, Dr. Urbanosky replied that "at least fifty percent of the time when a child this age presents with femur fracture of any sort, there is child abuse involved[.]"

Dr. Urbanosky was asked on cross-examination if she was aware of whether the hospital had an x-ray of Harley's chest on file which had been taken during his initial stay at Ruby Memorial Hospital. The doctor replied that she did not know because that was not part of her care of the child; there may have been because he was born premature with respiratory difficulties.

At the close of testimony, the circuit court expressed disbelief regarding whether the baby's leg could have been fractured according to the parents' explanation. The court was also concerned about the rib fractures, inadequate parenting skills, bonding, and the growth issue. These concerns were expressed in the court's order, which placed legal and physical custody of Harley with DHHR.

An adjudicatory hearing was scheduled for August 26, 1997. This hearing was continued with the caveat that an adjudicatory hearing would be held in two to four weeks or an agreed order granting a pre-adjudicatory improvement period would be submitted to the court. The parents requested a pre-adjudicatory improvement period. The motion was joined by DHHR and the guardian ad litem. The court entered an order on September 16, 1997, which granted a three-month pre-adjudicatory improvement period to both parents. The court reasoned the parents would likely fully participate in an improvement period because they had previously attended a multidisciplinary team meeting, had voluntarily underwent psychological evaluations, and had completed financial disclosure documents provided by DHHR. The court ordered DHHR to prepare and submit an individualized family case plan and, within sixty days, a progress report. A quarterly review hearing was held on December 19, 1997, wherein the court reviewed the progress reports and the status of the case and ordered the treatment team providers to submit biquarterly written reports to the case manager. These reports were to "include, but not be limited to, services provided and progress achieved during the preceding period."

Prior to the quarterly review hearing, on December 15, 1997, DHHR moved to revoke the improvement period of both parents. A hearing date was set for January 16, 1998. However, the motion was discussed at the status hearing held on January 14, 1998. The motion was therefore not brought before the court and an order was not entered; the parties and the guardian ad litem agreed it was unnecessary to conduct a hearing regarding revocation of the improvement period due to the fact that it had automatically expired. It was decided the case would proceed to adjudication and, if necessary, disposition. The court ordered increased visitation between Harley and his biological parents and scheduled the adjudicatory hearing and the dispositional hearing.

The adjudicatory hearing was held on March 11, 1998. Mary C. and Kenneth L. admitted neglect. Both denied abusing the child and stated they did not know who inflicted the physical abuse. The court found that Harley C. is a neglected child within the meaning of W. Va.Code § 49–1–3(h)(1) and that Mary C. and Kenneth L. are neglecting parents. The dispositional hearing was scheduled for April 7, 1998.

DHHR informed the court at the dispositional hearing that the department's position had changed; instead of recommending reunification of the family, the department was now seeking termination of parental rights. The stated reason for the change in position was that no explanation had been given for the injuries that had been inflicted upon Harley. In other words, no perpetrator had been identified. The psychologist who had been counseling the parents testified during cross-examination that he had been given no indication, during counseling sessions, as to who might have inflicted the injuries. At the close of testimony, DHHR made a motion to terminate the rights of the parents. This

motion was made because the individual who caused Harley's injuries had not been identified, despite compliance with the family case plan. The motion was opposed by the parents and the guardian ad litem.

In its dispositional hearing order, the court stated that it "found that there was no evidence as a whole in this case to support a termination of the parental rights of the respondents[.]" The court ordered reunification of the child with his natural parents; ordered that Mary C. and Kenneth L. be referred to a community agency for assistance; and dismissed the petition. Counsel for DHHR then asked the court to stay the ruling pending appeal to this Court. The motion was denied.

The foster parents moved to intervene in the proceedings. The lower court ordered intervention and granted the foster parents the right to submit evidence in accordance with the rule set forth in *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996). However, the court denied the foster parents access to the court file. The foster parents then requested that this Court grant an emergency stay and access to the court file. We stayed execution of the circuit court's order, ordered that Harley be returned immediately to the care and custody of the foster parents, allowed the biological parents to seek an order permitting supervised visitation, and allowed the foster parents "full and complete access to the official record on file in this case[.]" The foster parents now appeal the circuit court's dispositional order.

■ Preliminarily, we note that Mary C. and Kenneth L. and the guardian ad litem argue the foster parents have no standing to bring this appeal. They argue the foster parents are not parties to the action. Only DHHR or the guardian ad litem has standing to seek an appeal of the circuit court's decision. We disagree. This Court previously recognized the right of foster parents to bring an appeal of a circuit court's decision to return a foster child to the child's biological parents. *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996). In *Jonathan G.*, the circuit court granted standing to the Stems,

the foster parents of Jonathan G., and allowed them to intervene in the proceedings "in order to present another perspective on the best interests of the minor." *Id.* at 723, 482 S.E.2d at 900. Because the Stems were recognized as intervenors below, their right to seek an appeal of the lower court's order was not questioned. Their appeal was granted and their concerns were addressed by this Court.

■ In its April 28, 1998 order, the circuit court in the case *sub judice* unequivocally ordered that the St. Clairs "have standing to intervene in this matter[.]"

> By the very definition of intervention the intervenor is a party to the action. After intervention, he or she is as much a party to the action as the original parties, and renders himself vulnerable to complete adjudication of the issues in litigation between himself and the adverse party. To make his rights effectual he must necessarily have the same power as the original parties, subject to the authority of the court reasonably to control the proceedings in the case.

59 Am.Jur.2d *Parties* § 170 (1987). As intervenors, the St. Clairs are parties to the action. They have all the rights and responsibilities of any other party to the action, including the right to appeal to this Court. We therefore hold that foster parents who are granted standing to intervene in abuse and neglect proceedings by the circuit court are parties to the action who have the right to appeal adverse circuit court decisions.[2]

## I.

### Standard of Review

In this appeal, we are asked to reverse an order of the circuit court which found that Harley C. was a neglected child, but failed to find that he was an abused child within the meaning of the statute and prior opinions of this Court. We are asked to reverse the circuit court's ruling which reunited Harley with his biological parents instead of terminating their parental rights. The standard

---

2. For guidelines regarding the role of foster parents at termination proceedings, see *In re Jona-* *than G.*, 198 W.Va. 716, 726–29, 482 S.E.2d 893, 903–06 (1996).

of review in such cases is succinctly stated in *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syllabus Point 1, *id.*

After thoroughly reviewing the briefs and the record submitted in this case, we are "left with the definite and firm conviction that a mistake has been committed."

## II.

### *Adjudication of Abuse and Neglect*

The St. Clairs argue on appeal that the circuit court erred in not adjudicating Harley C. as an abused child. In support of this alleged error, the St. Clairs point to the testimony of Dr. Jones, Dr. Urbanosky, and Dr. Murphy as evidence that Harley C. was abused. A review of this evidence and a close look at the statutory definitions of "abused" and "neglected" leads us to conclude that Harley C. has indeed been abused. A neglected child is defined by W.Va.Code § 49–1–3(h)(1)(A) (1998) as a child

[w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian[.]

In contrast, an abused child is defined as "a child whose health or welfare is harmed or threatened by: (1) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home[.]" W.Va.Code § 49–1–3(a)(1) (1998). This Court has enlarged this definition by stating that "[i]mplicit in the definition of an abused child under West Virginia Code § 49–1–3 (1995) is the child whose health or welfare is harmed or threatened by a parent or guardian who fails to cooperate in identifying the perpetrator of abuse, rather choosing to remain silent." Syllabus Point 1, *W.Va. Dept. of Health and Human Resources v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996). Furthermore,

[t]he term 'knowingly' as used in West Virginia Code § 49–1–3(a)(1) (1995) does not require that a parent actually be present at the time the abuse occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse has occurred.

Syllabus Point 7, *id.* When presented with the medical testimony regarding Harley's injuries, we believe the parents should have known their child was abused and should have put forth a concerted effort to identify the abuser.

The medical evidence includes the testimony of Harley's pediatrician, Dr. Cathy Jones, who testified at the preliminary hearing that she was concerned about bonding and growth issues and had referred Harley to Child Protective Services even before the fracture injuries occurred. In fact, Dr. Jones testified that she was so concerned about Harley's failure to gain weight that she was going to admit him to the hospital to determine if he suffered from a complication such as reflux if he was not "showing better catch up growth at [his] next visit[.]" CPS was already ac-

tively following Harley at the time Dr. Jones contacted the agency.

Dr. Cogar, Dr. Jones' partner, examined Harley the day his leg was injured. Dr. Cogar was suspicious of abuse, and she reported her suspicions to DHHR. Dr. Murphy, a radiologist in Clarksburg who reviewed the x-ray of Harley's leg, called Dr. Jones to ask if Harley's case had been reported because he thought "this injury could be indicative of abuse and must be evaluated." Dr. Murphy believed that because of the rotation and nature of the injury, Harley's leg had been twisted until it broke. Due to the type of injury, Dr. Jones testified that she was "very concerned" about the child. When asked how the leg might have gotten twisted to the point that it broke, Dr. Jones answered one of the more common causes is that it is "inflicted;" grabbing the baby's leg and wrenching it would be consistent with a rotational injury. The doctor testified that theoretically, this type of injury rarely might possibly happen when a child falls off a couch. When questioned further regarding the possibility of the child getting his leg stuck between the cushions and falling off the couch, the doctor answered that one would still raise the issue of why the child was left on the couch unattended. Dr. Jones believes that femur fractures in five-month old children are very rare and are always suspicious.

Dr. Urbanosky, a resident in orthopedic surgery at Ruby Memorial Hospital, also testified at the preliminary hearing. Dr. Urbanosky stated that it is very unusual for a child of this age to suffer from a femur fracture, and, at least fifty percent of these injuries involve child abuse.[3] The doctor explained that these types of fractures generally occur in children who are involved in high energy types of activities, such as jumping, bouncing, or climbing. A child three months old, which would have been Harley's age at the time of the leg injury discounting for his premature birth, generally cannot roll over, scoot, or even sit up unattended. Consequently, the mother's explanation that Harley rolled over by himself and fell off the couch resulting in a rotational-type leg fracture greatly concerned Dr. Urbanosky.

Dr. Urbanosky also testified the baby gram revealed that Harley was suffering from one or more broken ribs. The only explanation the parents offered for the broken ribs was that perhaps the fracture(s) occurred during birth. Dr. Urbanosky testified that rib fractures are uncommon during birth as the chest is very mobile and soft. Furthermore, Harley was delivered by cesarean section, which Dr. Urbanosky testified is much more controlled than a vaginal delivery. Also, Harley's records did not indicate he had been injured at the time he was born.

Jennifer Gray testified that Harley was referred to her because of the fractured femur. She testified that she interviewed the parents in an effort to determine how the leg was broken. Mary C. said she left Harley on the couch, went to the bathroom, heard Harley crying, went back to the living room and Harley was on the floor. Kenneth L. was not home, but stated that Mary C. had related the same story to him. Ms. Gray reported that the seat of the couch is 18 to 20 inches off the floor, and the floor is carpeted.

Ms. Gray testified that from the time Harley was born, various services had been made available to the parents. These services were made available because Harley was premature and the hospital nurses identified bonding problems and limited knowledge of parenting. A home health nurse was assigned to the parents to provide services following Harley's initial release from the hospital. Right From the Start provided basic parenting training. The parents were also referred to the Early Intervention Program through the United Summit Center. Even though several appointments were made through the early intervention program, the parents attended only one session.

When questioned by the guardian ad litem as to whether Ms. Gray's position was that Harley was abused as opposed to neglected, Ms. Gray answered, "Since we are not positive that the fall from the couch is what caused his broken leg, then we feel that it is involved in "greater than equal to fifty percent for this agent injury."

---

**3.** Dr. Eric Jones, the treating staff orthopedist, conveyed to Dr. Urbanosky that child abuse is

more an issue of abuse during—relating to that specific injury." Ms. Gray believed the explanation of falling from the couch was not consistent with the type of injury Harley suffered.

At the close of testimony, the judge stated that the broken leg, the growth issue, the bonding issues, and the rib fractures concerned him. He stated that he did not believe any of these problems individually would rise to the level of abuse; however, he also did not believe the rotational fracture was caused by the child falling off the couch. The fractures coupled with bonding and growth issues caused the judge to find that Harley was abused or neglected and to continue him in foster care.

The parties agreed that Mary C. and Kenneth L. should receive a three-month preadjudicatory improvement period. Close to the end of the improvement period, DHHR filed a motion to revoke the improvement period for lack of meaningful participation. The Department believed the parents could not identify and meet Harley's needs. The court determined the improvement period lapsed on its own terms and the parties should proceed to adjudication.

At the adjudication hearing, Mary C. and Kenneth L. admitted Harley received extensive injuries while in their custody and that a failure to protect constituted neglect. In its order, the court found the parents "were willing to admit that medical evidence showed that the above-named infant child had suffered physical abuse while in their custody as his parents, even though they denied abusing the child and did not know who inflicted the physical abuse." The court concluded that Harley was a neglected child and the parents were neglecting parents because the "infant child is harmed or threatened by a present failure or inability of the above-named infant child's parents to supply the child with necessary supervision, when such failure or inability is not due primarily to a lack of financial means on the part of the parents." Even though the parents admitted the child was abused while in their custody, the court failed to inquire into who inflicted the abuse and whether the parents made any effort to identify the abuser.

We are clearly convinced somebody severely injured this small child on two separate occasions. Injured him badly enough to break his bones. Although this immobile child was constantly under adult supervision, no one seems to know who inflicted the abuse. In their briefs to this Court, the parents say they attempted to identify the abuser. However, both parents merely offer blanket conclusions; neither offers an explanation of the efforts he or she undertook to attempt to identify the perpetrator. The record contains no showing of any effort undertaken by either parent in an attempt to determine who inflicted this abuse on their child.

■ This Court has previously said: " 'Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children.' Syl. pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996)." Syllabus Point 3, *Matter of Taylor B.*, 201 W.Va. 60, 491 S.E.2d 607 (1997). Once again we reiterate that "[i]mplicit in the definition of an abused child under West Virginia Code § 49–1–3 (1995) is the child whose health or welfare is harmed or threatened by a parent or guardian who fails to cooperate in identifying the perpetrator of abuse, rather choosing to remain silent." Syllabus Point 1, *W.Va. Dept. of Health & Human Resources v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996). As failure to attempt to identify the abuser is contained in the definition of "abuse," we believe the circuit court erred in determining Harley was neglected rather than abused. We also believe this child remains at risk if returned to the home of his parents.

### III.

#### *Disposition*

■ The dispositional hearing was held on April 7, 1998. Between the time the adjudication and the dispositional hearings were held, the Court Appointed Special Advocate (CASA) appointed to serve on this case wrote a letter to the court expressing serious con-

cerns about Harley's safety. Specifically, she wrote:

> It is also a concern that these injuries have been more or less ignored throughout these proceedings. We are very pleased that the parents have done so well in addressing the neglect issues in their improvement period, but it has been as if the injuries never happened. Has it been forgotten that the reason this child was removed was because of the injures—serious ones? ?

At the dispositional hearing, the Department moved for termination of parental rights due to the fact that the abuser or perpetrator had not been identified. Counsel for the mother stated that he believed it was "highly unlikely that either of these individuals [Mary C. or Kenneth L.] had any direct involvement with the injures." He went on to state that, "Notwithstanding we have no other viable explanation for how they may have occurred and notwithstanding also that none of the medical evidence that we have seen but not heard in the context of formal testimony under oath that would support really any other theory but that some active type of abuse was perpetrated upon the child." Nonetheless, counsel for Mary C. moved that custody be returned to these parents. Counsel for Kenneth L. and the guardian ad litem also sought reunification.

The judge determined there was no evidence to support termination even though he acknowledged he

> was probably the most skeptical person in this room when we saw pictures of the couch at the preliminary hearing and their surmising or suggesting that he fell and twisted and those sorts of things was the cause of the injury. There wasn't anybody that believed that less than I did and there isn't anybody including [the CASA's] worry on this that worries more about this than I do.... [B]ut it seems to me that there is no evidence that the court is aware of, looking at the record as a whole and I guess I am not limiting myself to what was produced today, nor has the State proffered any and I didn't ask for a proffer but it seems to me that there is no evidence

that would substantiate a termination of these parents' rights[.]

The court ordered that Harley be returned to the physical and legal custody of Mary C. and Kenneth L.

■ The St. Clairs maintain the lower court erred in not terminating the parental rights of Mary C. and Kenneth L. We agree. This Court has said:

> Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.

Syllabus Point 3, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993). The parents admit Harley suffered extensive physical abuse while in their custody. There is no evidence either one of them seriously attempted to identify the abuser. The evidence presented as to how the injuries may have occurred conflicts with the medical evidence. Thus, the court erred in reuniting this child with his parents rather than terminating Mary C.'s and Kenneth L.'s parental rights.

## IV.

### *Conclusion*

For the foregoing reasons, we find the Circuit Court of Harrison County erred in not adjudicating Harley C. an abused child and in failing to terminate the parental rights of Mary C. and Kenneth L. The ruling of the circuit court is reversed and remanded to enter an order consistent with this opinion.

Reversed and remanded.