525 S.E.2d 315

## In re MICHAEL RAY T., Scottie Lee T., and Tonya Lynn T.

### No. 26639.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 2, 1999.

Decided Dec. 3, 1999.

Harold B. Wolfe, III, Akers & Wolfe, Princeton, West Virginia, Attorney for the Appellants, Paul and Virginia Williams.

Darrell V. McGraw, Jr., Attorney General, Katherine M. Mason, Assistant Attorney General, Beckley, West Virginia, Thomas L. Berry, Assistant Prosecutor, Princeton, West Virginia, Attorneys for the Appellee, West Virginia Department of Health and Human Resources.

Mary Ellen Griffith, Bell & Griffith, L.C., Princeton, West Virginia, Guardian ad Litem for the Appellees, Michael Ray T., Scottie Lee T., and Tonya Lynn T.

DAVIS, Justice:

The appellants herein, and plaintiffs below, Paul and Virginia Williams [hereinafter collectively referred to as "the Williamses"], appeal from an order entered May 11, 1999, by the Circuit Court of Mercer County. By

that order, the court denied the Williamses' motion to intervene in the abuse and neglect proceedings concerning their former foster children, Michael Ray T.[1] [hereinafter referred to as "Michael"], Scottie Lee T. [hereinafter referred to as "Scottie"], and Tonya Lynn T. [hereinafter referred to as "Tonya"]. The court further refused to consider the Williamses' motion for custody, wherein they sought the return of these children to their care following the youngsters' removal from their foster care by the West Virginia Department of Health and Human Resources [hereinafter referred to as "DHHR"]. Upon a review of the parties' arguments, the appellate record, and the pertinent authorities, we conclude that the circuit court did not abuse its discretion by refusing the requested intervention. Therefore, we affirm the decision of the Circuit Court of Mercer County.

## I.

## FACTUAL AND PROCEDURAL HISTORY

The facts underlying the instant appeal are as follows. On April 8, 1998, the DHHR filed a petition in the Circuit Court of Mercer County requesting the immediate and temporary transfer of custody of Michael,[2] Scottie,[3] and Tonya[4] to the DHHR as a result of the perceived imminent danger the children would face if they remained in the home of their biological parents, Frank T. and Lizzie T. The incidents leading to this petition centered around the life-threatening injuries sustained by then six-week-old Michael when he was repeatedly and viciously attacked by rodents in his parents' home on April 4, 1998. Additionally, the DHHR remained concerned that Lizzie would again return to the family home with Michael's siblings despite the persistence of the rodent infestation and warnings by DHHR officials that the home was not safe for children. The circuit court found that "[t]he danger presented by the child(ren)'s present circumstances creates an emergency situation which has made efforts to avoid removing the child(ren) from the home unreasonable or impossible," and transferred their temporary custody to the DHHR.

As a result of the critical injuries he sustained, Michael was hospitalized for an extended period of time at Women and Children's Hospital, in Charleston, West Virginia. His siblings, Tonya and Scottie, were placed with a foster family[5] following their removal from their parents' home. After Michael's partial recovery and release from the hospital, he was placed into foster care with the Williamses[6] on April 16, 1998. Due to the severity of Michael's injuries, Tonya and Scottie were not placed with the Williamses until July, 1998, when their younger brother had recovered further.[7] By order entered August 14, 1998, the circuit court adjudicated the children to have been neglected by their biological parents.[8] On September 11, 1998,

1. Due to the sensitive nature of the facts involved in this appeal and our efforts to protect the privacy of the juveniles involved, we adhere to our usual practice of utilizing the infants' last initials rather than their full surnames. *See, e.g.,* *State ex rel. Paul B. v. Hill,* 201 W.Va. 248, 250 n. 1, 496 S.E.2d 198, 200 n. 1 (1997); *State ex rel. Diva P. v. Kaufman,* 200 W.Va. 555, 559 n. 2, 490 S.E.2d 642, 646 n. 2 (1997); *In re Tiffany Marie S.,* 196 W.Va. 223, 226 n. 1, 470 S.E.2d 177, 180 n. 1 (1996).

2. Michael's birthday is February 19, 1998.

3. Scottie was born on April 11, 1996.

4. Tonya's date of birth is June 3, 1994.

5. Tonya and Scottie were not immediately placed with the Williamses, but rather with a different foster family.

6. The Williamses had been approved as a specialized foster care home and were sponsored in their provision of such care by Try–Again Homes, Inc.

7. Because Michael's injuries had been so numerous and severe, there was concern that his siblings might pose a risk of infection to him and that the children would sustain psychological damage if they were reunited before Michael had healed.

8. The adjudication of neglect was based upon the definition of that term contained in W. Va.Code § 49–1–3(g)(1)(A) (1994) (Repl.Vol.1996):

 "Neglected child" means a child . . .
 [w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or

the circuit court, during a dispositional hearing, granted Frank and Lizzie a six-month post-adjudicatory improvement period, and continued legal and physical custody of the children with the DHHR.

From the time of her placement into the Williamses' home, Tonya exhibited various behavioral and disciplinary problems, believed to be the result of parentification.[9] Although Tonya and Scottie had been having regular supervised visitation with their biological parents since their removal in April, 1998,[10] following one such supervised visit on October 14, 1998, Tonya's conduct worsened dramatically.[11] In an attempt to protect Scottie and Michael from their sister, Mrs. Williams requested respite care for Tonya.[12] Around the same time, Tonya confided in her foster parents that, during the recent supervised visit, she had been sexually abused by her biological mother. The Williamses reported this incident to the Child Protective Services [hereinafter referred to as "CPS"] caseworker who formerly had handled the children's case.[13] Nevertheless, Mr. and Mrs. Williams received the impression that the allegation would not be investigated and that no further action would be taken with regard thereto, due in large part to Tonya's failure to cooperate with DHHR officials by telling them her story.

Following this incident, Tonya's weekly counseling sessions increased in number, and the guardian ad litem and the State jointly moved to temporarily suspend Tonya's visits with Frank and Lizzie. By order entered December 15, 1998, the circuit court suspended, for sixty days, supervised visitation between Tonya and her biological parents.[14] In late December, 1998, the Williamses again requested respite care for Tonya because of her continued defiance of family rules. Upon Tonya's return to the Williamses' home, her demeanor improved.

Thereafter, the DHHR alleges that, as a result of their continuing difficulties with Tonya, the Williamses were admonished and instructed as to acceptable forms of discipline during a multidisciplinary treatment team

education, when such refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian. . . .

For the current definition of this term, see W. Va.Code § 49–1–3(h)(1)(A) (1999) (Repl.Vol. 1999).

9. When she resided with her biological parents, Tonya reportedly enjoyed a great deal of control over her circumstances and assumed the care of and responsibility for her younger siblings. One of Tonya's counselors explained her behavior thusly:

The term parentified child or parentification is widely accepted in the field of psychology and counseling to refer to the process in which a child is routinely permitted to assume responsibilities which appropriately belong to parents. For a young child, this is a frightening experience, because, at some level, the child realizes that s/he is unable to adequately assume the responsibilities being given. On the other hand, the child adapts to the situation by enjoying the feeling of power that results from being in charge. Being in charge becomes a survival skill for a young child whose parents do not consistently take responsibility and make decisions. If the child does not take charge, it is possible that nobody else will and this could be potentially life threatening. Therefore, when an adult attempts to assume the responsibilities such a child has been inappropriately given, the child customarily reacts with resistance and resentment, and is likely to fight to retain control. The result is a power struggle between the child and whichever adult is attempting to parent that child.

10. Frank and Lizzie's supervised visits with Michael began in June, 1998, following his convalescence.

11. Such misconduct included abusive and self-abusive behavior, lying, and stealing.

12. Generally,

"respite care" envisions the short-term placement of a child outside of the child's home environment in order to permit the child's parent(s) or guardian(s) and the child a temporary reprieve from a stressful familial situation. Respite care is often sought by families who have children with severe physical, emotional, or mental difficulties as a type of "cooling off" period before the family relationship becomes irreparably damaged.

State ex rel. Paul B. v. Hill, 201 W.Va. at 251 n. 9, 496 S.E.2d at 201 n. 9.

13. The Williamses state that although the children's case had recently been assigned to a different caseworker, they contacted the former caseworker because they were more familiar with her.

14. Frank and Lizzie continued to enjoy supervised visitation with Scottie and Michael.

[hereinafter referred to as "MDT"] meeting on January 12, 1999. Because of the persistent "power struggle" between Tonya and Mrs. Williams, arising from Tonya's defiance and attempt to obtain and retain control, and concerns that the Williamses had inappropriately and negatively discussed Frank and Lizzie in the child's presence, the team also discussed the possibility of removing the children from the Williamses' care.[15] By letter to Mr. and Mrs. Williams dated January 21, 1999, the CPS worker assigned to the children's case reiterated the tenor of the MDT meeting:

> The team members agreed that corrections needed to be made in your approach to dealing with Tonya and that if these corrections can not be made a team meeting will be held to discuss the removal of the T[.] children. . . .
>
> The Department [DHHR] looks forward to maintaining these children in your home *as long as it is in the best interest of the children.*

(Emphasis added).

In February, 1999, the circuit court ordered the gradual resumption of visits between Tonya and her biological parents. On March 26, 1999, the circuit court ordered the extension of the biological parents' improvement period to coincide with the expiration of their period of probation [16] in October, 2002. The circuit court also allegedly ordered the commencement of in-home visitation, whereby the children would visit Frank and Lizzie in their home. The Williamses submit that, upon explaining these visits to Tonya, she revealed that she had sustained numerous additional instances of sexual abuse, involving both of her biological parents and other relatives, before she had been removed from her parents' home.[17] Apparently out of concern for Tonya's safety and as a result of the perceived inaction by the DHHR in response to the October report of sexual abuse, the Williamses penned a nine-page letter, disclosing the children's full names, revealing certain confidences about them, and detailing Tonya's allegations, and sent it to various government officials and agencies on March 30, 1999.[18] Neither the DHHR nor the children's guardian ad litem had prior knowledge of this correspondence.

Presumably perceiving the letter to be a breach of the Williamses' duty of confidentiality and apparently due to growing concern about their care of the children, the DHHR removed the sibship from the Williamses' home on April 5, 1999, believing such removal to be in the children's best interests. The children subsequently were placed with another foster family. Following the children's removal from the Williamses' home, Try-Again Homes, Inc., terminated its sponsorship of the Williamses as foster care

---

15. In the event that Tonya would be removed from the Williamses' care, her siblings would also be relocated to ensure the unity of the sibship. *See State ex rel. Paul B.*, 201 W.Va. at 257, 496 S.E.2d at 207 (alluding to "State's public policy of attempting to unite siblings in foster care placements"). *See also* W. Va.Code § 49–2–14(b(3),d,e,f) (1995) (Repl.Vol.1999) (detailing DHHR's efforts to place siblings with single foster family as long as such placement is in children's best interests).

16. Frank and Lizzie are on probation in conjunction with the companion case to the neglect proceedings in which they had been charged with criminal child abuse, pursuant to W. Va. Code § 61–8D–1, *et seq.*

17. Upon learning such information, the children's guardian ad litem moved to suspend visitation between Frank and Lizzie and the three children pending further investigation of the sexual abuse allegations. The circuit court granted this motion on April 16, 1999.

18. This letter was sent, by facsimile, to the following governmental agencies and officials: "Trooper Hinzman[,] Bob Wise[,] Sen. Rockefeller[,] Sen. Byrd[,] Gov. Underwood[,] The Whitehouse Office of Agency Liaison[,] Mr. Shank at DHHR[,] . . . Justice John E. [sic] McCusky [sic]—WV Supreme Court[,] WV Advocate[,] Joan Ohl[,] Bill Sadler[,] Tom Berry[,] Judge David Knight[,] Kathie King—DHHR CPS Office[,] State Prosecutor's Office[,] State Ethics Committee[,] Hillary Clinton's Office[, and] Dept. of HHS Children's Bureau, Wash[ington], DC."

The appellate record does not indicate whether a prior investigation of these charges had been initiated as a result of Tonya's October allegations, however an investigation was commenced on April 2, 1999, in response to communications by Tonya's counselor to the Princeton detachment of the West Virginia State Police. Failure to report suspected child abuse to the appropriate authorities is a misdemeanor offense. W. Va.Code § 49–6A–8 (1984) (Repl.Vol.1999).

providers, effective April 5, 1999, citing "the major breach of confidentiality demonstrated by the letter [the Williamses] disseminated to people who are not covered by Try–Again Homes and/or Department of Health and Human Resources release of information."

As a result of the children's removal from their home, the Williamses filed a Motion to Intervene in the children's abuse and neglect proceedings and a motion requesting the circuit court to return the children to their foster care. By order entered May 11, 1999, the circuit court denied intervention and declined to consider whether the children should be returned to the Williamses' care. In so ruling, the circuit court noted that

> a court has the discretion to allow foster parents who have physical custody of a child to intervene in abuse and neglect proceedings. *See In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996). However, in the present case, the Williams [sic] no longer have physical custody of the children.
>
> In their Motion, the Williams [sic] allege that the DHHR "improperly and unlawfully removed" the children from their home. This alleged improper removal, and the request to file a motion to have the three children returned to their foster care would be more appropriately addressed through an extraordinary remedy such as a writ of mandamus.[19] Therefore, this Court will not address whether the DHHR should return the children to the foster care of the Williams [sic] at this time.
>
> [T]his Court does not find that the Williams [sic] have a right to intervene....

19. To date, the Williamses have not attempted to obtain their requested relief through an extraordinary remedy in either the circuit court or this Court.

20. Despite its rejection of the Williamses' motion to intervene, the court recognized "the role the Williams [sic] have played in the children's life and f[ound] that input from the Williams [sic] would be valuable in determining the best interest of the T[.] children." Accordingly, the court held a limited evidentiary hearing on June 10, 1999, at which only the Williamses were permitted to testify and present exhibits, but not addi-

(Footnote added).[20] From this circuit court decision, the Williamses appeal to this Court.[21]

## II.

### STANDARD OF REVIEW

Prior to addressing the merits of the Williamses' assignments of error, we must consider the general standard for evaluating the propriety of a circuit court's ruling.

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. pt. 2, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997). As more precise standards govern the specific issues presented for our determination, we will incorporate these additional methods of review in our discussion of those issues.

## III.

### DISCUSSION

On appeal to this Court, the Williamses raise two assignments of error: (1) the circuit court erred in denying their motion to intervene and (2) the circuit court improperly refused to consider their motion for custody. The DHHR, joined by the children's guardian ad litem, rejects the Williamses' contentions and urges this Court to uphold the circuit court's rulings.

tional witnesses, regarding the children's best interests.

21. Since the Williamses filed their petition for appeal in this Court, on July 19, 1999, the DHHR, during a July 23, 1999, hearing, advised the circuit court that it would not amend the neglect petition to include sexual abuse allegations due to insufficient evidence thereof. Subsequently, by order entered October 8, 1999, the circuit court terminated Frank and Lizzie's parental rights vis-a-vis Michael, Scottie, and Tonya. A farewell visit remains to be scheduled.

### A. Motion to Intervene

 The Williamses first assign as error the circuit court's denial of their motion to intervene. In the case of *In re Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893 (1996), we set forth guidelines regarding foster parents' participation in abuse and neglect proceedings:

> The foster parents' involvement in abuse and neglect proceedings should be separate and distinct from the fact-finding portion of the termination proceeding and should be structured for the purpose of providing the circuit court with all pertinent information regarding the child. *The level and type of participation in such cases is left to the sound discretion of the circuit court* with due consideration of the length of time the child has been cared for by the foster parents and the relationship that has developed. To the extent that this holding is inconsistent with *Bowens v. Maynard,* 174 W.Va. 184, 324 S.E.2d 145 (1984), that decision is hereby modified.

Syl. pt. 1, *id.* (emphasis added). From this language, it is apparent that our review of the circuit court's decision regarding the Williamses' intervention motion is for an abuse of discretion. "Typically, a grant of discretion to a lower court commands this Court to extend substantial deference to such discretionary decisions." *State v. Allen,* —— W.Va. ——, ——, —— S.E.2d ——, ——, slip op. at 20, 1999 WL 1040545 (No. 25980 Nov. 17, 1999). In other words, " '[u]nder the abuse of discretion standard, we will not disturb a circuit court's decision unless the circuit court makes a clear error of judgment or exceeds the bounds of permissible choices in the circumstances.' " *Hensley v. West Virginia Dep't of Health & Human Resources,* 203 W.Va. 456, 461, 508 S.E.2d 616, 621 (1998) (quoting *Gribben v. Kirk,* 195 W.Va. 488, 500, 466 S.E.2d 147, 159 (1995)).

Reviewing the circuit court's decision, we note, at the outset, that the Williamses were not actually the foster parents of Michael, Scottie, and Tonya at the time they sought intervention. Rather, they stood in the position of the children's former foster parents. Under a strict application of our holding in *Jonathan G.,* which dealt exclusively with the child's then current foster parents, the Williamses are not entitled to intervene in the children's abuse and neglect proceedings. *See* Syl. pt. 1, 198 W.Va. 716, 482 S.E.2d 893. Nevertheless, we must consider the matter further. As this emerging new body of law has dealt previously only with the intervention rights of current foster parents, the question of whether a former foster parent has standing to intervene in the abuse and neglect proceeding concerning their former foster child(ren) is a matter of first impression in this Court. *See* Syl. pt. 1, *In re Harley C.,* 203 W.Va. 594, 509 S.E.2d 875 (1998) ("Foster parents who are granted standing to intervene in abuse and neglect proceedings by the circuit court are parties to the action who have the right to appeal adverse circuit court decisions."); Syl. pt. 1, *Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893.

 The intervention rights we previously have afforded to current foster parents are limited, both by the circuit court's discretion to grant or deny such intervention and by the primary purpose for such intervention, that is to "provid[e] the circuit court with all pertinent information regarding the child." Syl. pt. 1, in part, *Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893. When assessing the right of individuals to participate in abuse and neglect proceedings, we necessarily must be guided by our oft-repeated mantra that child abuse and neglect proceedings are, without fail, to be resolved as expeditiously as possible in order to safeguard the welfare and best interests of the fragile infant parties to such proceedings. " 'Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security.' Syl. Pt. 1, in part, *In re Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991)." Syl. pt. 3, *Jonathan G.,* 198 W.Va. 716, 482 S.E.2d 893.

Although "we have repeatedly admonished lawyers and the circuit courts regarding the critical need for prompt resolution of child abuse and neglect proceedings," *Jonathan G.,* 198 W.Va. at 733, 482 S.E.2d at 910, this cautionary is not solely a rule adopted by this

**442**

Court. Rather, this directive is also a mandate imposed by the Legislature:

> Any petition filed and any proceeding held under the provisions of this article shall, to the extent practicable, be given priority over any other civil action before the court, except proceedings under article two-a [§ 48–2A–1 et seq.], chapter forty-eight of this code and actions in which trial is in progress.

W. Va.Code § 49–6–2(d) (1996) (Repl.Vol. 1999).

> "The clear import of the statute [West Virginia Code § 49–6–2(d)] is that matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible." Syl. Pt. 5, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991).

Syl. pt. 6, *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893.

█ This need for rapid finality in abuse and neglect proceedings is attributable to the overriding concern for the subject child's welfare. " '[A] child deserves resolution and permanency in his or her life....' " *Jonathan G.*, 198 W.Va. at 726, 482 S.E.2d at 903 (quoting *State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 260, 470 S.E.2d 205, 214 (1996)). Moreover, "the best interests of the child is the polar star by which decisions must be made which affect children." *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) (citation omitted). Accordingly, in the interest of expediting the resolution and conclusion of abuse and neglect proceedings, we are hesitant to expand the realm of intervenors to individuals who are no longer guardians or custodians of the children at issue for fear that " '[u]njustified procedural delays' " undoubtedly would attend the ever-increasing roster of interested participants. *See* Syl. pt. 3, in part, *Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893; Syl. pt. 1, in part, *Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365.

█ Furthermore, while it is true that former foster parents may have an interest in participating in cases involving children who once were entrusted to their care, we must not forget that, in the present context, the rights of adults are subordinate to those of the involved children. " ' "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996).' Syllabus Point 3, *Matter of Taylor B.*, 201 W.Va. 60, 491 S.E.2d 607 (1997)." Syl. pt. 3, *In re Harley C.*, 203 W.Va. 594, 509 S.E.2d 875. In other words, "[c]ases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)." Syl. pt. 7, *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995). It is for these reasons, then, that we hold that former foster parents do not have standing to intervene in abuse and neglect proceedings involving their former foster child(ren). Based upon our decision, we further conclude that the circuit court did not abuse its discretion by refusing the Williamses' intervention motion.

█ In addition to our recognition of the preeminent rights of the infant child(ren) subject to abuse and neglect proceedings and our acknowledgment of the detrimental delays that would result from the extension of intervention to former foster parents, we wish to identify the very limited role that former foster parents may have in assisting a circuit court in determining the child(ren)'s best interests. As we noted in *Jonathan G.*, the purpose behind allowing foster parents to intervene is to provide the court with information concerning the child(ren) with whose care they have been charged. Syl. pt. 1, in part, 198 W.Va. 716, 482 S.E.2d 893. Former foster parents, as the former guardians, custodians, and/or caretakers of the subject child(ren), similarly have knowledge of the child(ren) that could be beneficial to a court considering the child(ren)'s best interests and ultimate fate. While complete intervention is not the proper role for former foster parents to participate in abuse and neglect proceedings, we do believe their input would, in many cases, be instructive and facilitate

the court's decision. Therefore, we hold that a circuit court may, in its sound discretion, permit former foster parents to present evidence regarding their · former foster child(ren) to assist the court in assessing the best interests of such child(ren) subject to an abuse and neglect proceeding. Based upon the record evidence in the instant appeal, we note, with approval, the circuit court's decision to permit the Williamses to testify and present evidence regarding Michael, Scottie, and Tonya, as they were in a position, as the children's former foster parents, to provide pertinent first-hand information for the court's consideration.

■ At this juncture, we wish also to applaud the Williamses' continued efforts to vigilantly protect what they perceive to be the best interests of the children previously entrusted to their care. Their dedication and devotion to their former young charges is readily apparent from their appearance before this Court. As we will explain further in Section III.B., *infra*, we are without sufficient information to determine whether the DHHR's removal decision was in error or whether the best interests of the children dictate their return to the Williamses'· care. In any event, we do want to emphasize that, while the Williamses do not have a right of intervention in the underlying abuse and neglect proceedings, they may not be completely devoid of remedies should they desire to pursue this matter further. Such alternative remedies at their disposal may include the extraordinary remedies of mandamus, as alluded to in the circuit court's order, and habeas corpus. *See* Syl. pt. 1, *State ex rel. Allstate Ins. Co. v. Union Pub. Serv. Dist.*, 151 W.Va. 207, 151 S.E.2d 102 (1966) ("Mandamus is a proper remedy to require the performance of a nondiscretionary duty by various governmental agencies or bodies."); Syl. pt. 2, *West Virginia State Dep't of Pub. Assistance v. Miller*, 142 W.Va. 855, 98 S.E.2d 783 (1957) ("The writ of habeas corpus is a proper remedy to determine the custody of a child, but it will not be issued in a pending suit, of which the court has jurisdiction, involving the temporary custody of such child; nor will a writ of prohibition lie against the judge of the court which has so taken jurisdiction."). As both of these pro-

ceedings would be external to the underlying abuse and neglect proceedings, there exists a lesser likelihood of unnecessary and disruptive procedural delay. *See* Syl. pt. 3, *Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893; Syl. pt. 1, *Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365.

### *B. Motion for Custody*

. The Williamses' second assignment of· error centers around the circuit court's refusal to consider their motion for custody through which they sought the return of the children to their care. In its most basic form, this argument is essentially a challenge to the ·DHHR's decision to remove the children from their foster placement with Mr. and Mrs. Williams. A thorough review of the limited appellate record presented for our consideration herein fails to reveal any information regarding the DHHR's precise rationale for removing the children from the Williamses' foster care and lacks the circuit court's assessment as. to the propriety of such removal or the children's subsequent placement with another foster family. Coupled with the insufficient record is the fact that the circuit court declined to consider the Williamses' custody motion and, thus, did not determine whether the children should or should not be returned to their foster care.

■ We frequently have stated that parties are duty-bound to preserve evidence in the record to ensure that this Court may conduct a complete review of the challenged lower court proceedings. "In a long line of unbroken precedent, this Court has held that the responsibility and burden of designating the record is on the parties and that appellate review must be limited to those issues which appear in the record presented to this Court." *State v. Honaker*, 193 W.Va. 51, 56, 454 S.E.2d 96, 101 (1994) (footnotes omitted) (citation omitted). Thus, where

an appellant [has] spurn[ed] his or her duty and drape[d] an inadequate or incomplete record around this Court's neck, this Court, in its discretion, either has scrutinized the merits of the case insofar as the record permits or has dismissed the appeal

**444**

if the absence of a complete record thwarts intelligent review.

*State v. Miller,* 194 W.Va. 3, 14, 459 S.E.2d 114, 125 (1995) (citations omitted).

Furthermore, a constant refrain of this Court is that we will not consider, for the first time on appeal, a matter that has not been determined by the lower court from which the appeal has been taken. "[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review." Syl. pt. 6, in part, *Parker v. Knowlton Constr. Co., Inc.,* 158 W.Va. 314, 210 S.E.2d 918 (1975). Therefore, " ' "[i]n the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which were not considered and decided by the court from which the appeal has been taken." Syllabus Point 1, *Mowery v. Hitt,* 155 W.Va. 103[, 181 S.E.2d 334] (1971).' Syl. pt. 1, *Shackleford v. Catlett,* 161 W.Va. 568, 244 S.E.2d 327 (1978)." Syl. pt. 3, *Voelker v. Frederick Bus. Properties Co.,* 195 W.Va. 246, 465 S.E.2d 246 (1995). *See also* Syl. pt. 2, *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958) (same).

Absent an adequate record detailing the DHHR's specific reasons for removing the children from the Williamses' home and the lack of a determination of this issue by the circuit court, we are precluded from reviewing the precise merits of this assignment of error.

Once again, however, we wish to commend the vigilance with which the Williamses sought to protect the perceived best interests of their former foster children, Michael, Scottie, and Tonya. We also appreciate the quintessential catch–22 in which Mr. and Mrs. Williams found themselves when they believed that Tonya's allegations of sexual abuse had not been adequately addressed by the appropriate governmental officials. It is unfathomable that any parent, biological, foster, adoptive, or otherwise, would not be terrified by the prospect that his or her child might be placed into a situation posing a risk of imminent danger and that such parent would not do everything in his or her power to protect his or her child. Nonetheless, we caution individuals entrusted with the care and/or custody of children involved in abuse and neglect proceedings of the utmost confidentiality attending these matters and the statutory prohibition of breaching such confidences. *See* W. Va.Code § 49–7–1 (1997) (Supp.1997).[22]

## IV.

### CONCLUSION

In conclusion, we find that the circuit court did not abuse its discretion in denying the Williamses' motion to intervene in the underlying abuse and neglect proceedings, as they were not the current foster parents but rather the former foster parents of the infant children involved in such proceedings. Accordingly, we hereby affirm the May 11, 1999, order of the Circuit Court of Mercer County.

Affirmed.

Judge GARY L. JOHNSON, sitting by temporary assignment.

Justice SCOTT did not participate.

---

22. The version of this statutory provision applicable to the events underlying this appeal commands:

> (a) Except as otherwise provided in this chapter, all records and information concerning a child or juvenile which are maintained by a state department, agency, court or law-enforcement agency shall be kept confidential and shall not be released or disclosed to anyone, including any federal or state agency.
>
> . . . .
>
> (e) Any person who willfully violates the provisions of this section is guilty of a misde-

meanor and, upon conviction thereof, shall be fined not more than one thousand dollars, or confined in the county or regional jail for not more than six months, or be both fined and confined. A person convicted of violating the provisions of this section shall also be liable for damages in the amount of three hundred dollars or actual damages, whichever is greater.

W. Va.Code § 49–7–1 (1997) (Supp.1997). For the current version of this statute, see W. Va. Code § 49–7–1 (1999) (Repl.Vol.1999).