**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **M.W., K.H., and L.R.**

**No. 21-0707** (Kanawha County 20-JA-215, 20-JA-216, and 20-JA-217)

**MEMORANDUM DECISION**

Petitioner Mother S.H., by counsel Sandra K. Bullman, appeals the Circuit Court of Kanawha County's August 25, 2021, order terminating her parental rights to M.W., K.H., and L.R.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Brittany Ryers-Hindbaugh, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Bryan B. Escue, filed a response on behalf of the children also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating her parental rights when she was substantially complying with her improvement period and without imposing a less restrictive dispositional alternative.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In May of 2020, the DHHR filed a child abuse and neglect petition alleging that petitioner educationally neglected then-eight-year-old L.R., was abusing nonprescribed Suboxone and marijuana while caring for then-eight-month-old M.W., and engaged in domestic violence with M.W.'s father, C.W. According to the DHHR, petitioner and C.W. had significant drug histories and had been using Suboxone as drug treatment for at least two years. Also, the DHHR workers interviewed L.R. and then-five-year-old K.H., who described incidents of domestic violence between petitioner and C.W., including that C.W. threw and broke things. Further, the DHHR alleged that petitioner and C.W. failed to take M.W. for routine medical check-ups since her birth, and that the child had an untreated urinary tract infection. Most importantly, the DHHR alleged

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

that while the family was under investigation for the above issues, M.W. presented to the emergency room with a broken leg. That child's parents claimed that she fell off of a three-foot-tall bed when petitioner took her upstairs to co-sleep and while C.W. was downstairs cooking dinner. The treating doctor opined that the injury was inconsistent with the explanation given by the parents because it was a "high intensity fracture on the interior" femur, which was likely caused by being forcefully grabbed by the foot or leg, not the child falling on the floor and onto the leg.

At the preliminary hearing held in June of 2020, M.W.'s treating doctor testified that the parents' explanation of the child falling approximately three feet from the top of the bed and onto a rug, was inconsistent with the child's fractured femur. She testified that M.W.'s inner femur and growth plate had fractured, and, as the femur is the strongest bone in the body, a high intensity force would have caused the bone to fracture. She stated that a short linear fall to the floor would not have caused M.W.'s fracture. Additionally, she stated that the location of the fracture was inconsistent with a fall as the outer part of the femur, which would have made impact with the floor, was intact. Finally, the doctor stated that at the time of the injury, M.W. was immobile and only able to raise herself up, thus calling into question how she allegedly crawled across the bed and fell. The court found probable cause that the children were abused and neglected.

The circuit court held a contested adjudicatory hearing in September of 2020 and adjudicated petitioner and C.W. as abusing parents, largely based upon prior testimony at the preliminary hearing that M.W.'s broken leg was caused by nonaccidental injury. Over the objection of the DHHR, the court granted petitioner and C.W. post-adjudicatory improvement periods, the terms of which required them to participate in a drug treatment program, complete parenting and adult life skills education classes, attend domestic violence classes, exercise supervised visitations, and submit to drug screening.

In January of 2021, the court held a review hearing, wherein the DHHR reported that petitioner and C.W. had been substantially complying by regularly drug screening and completing their domestic violence classes. As such, the court continued their improvement periods and granted increased and unsupervised visitations with the children. Further, the DHHR established paternity of K.H., and the court awarded visitations with that child's father.

Petitioner and C.W. underwent parental fitness and psychological evaluations in March of 2021. Among the records reviewed by the evaluator was a police report, which showed several inconsistencies in the parents' statements to the DHHR and the police regarding M.W.'s broken leg. In petitioner's statement to the police, she claimed M.W. fell when she left the room and not while the child was sleeping with her. Also in the police report, petitioner stated that prior to M.W.'s fall, C.W. was also in bed with her and the child but went downstairs to sleep on the couch. This statement differed from prior statements given to DHHR workers that C.W. had been downstairs the entire time making dinner. Also, petitioner told the police that the couple had at least four arguments during which C.W. violently grabbed M.W. from petitioner. Additionally, the evaluation noted that petitioner's mother reported that petitioner called her crying after M.W. was taken to the emergency room and stated that C.W. had placed M.W. with her when she was asleep and that she did not know that the child was in bed with her when M.W. fell. This statement is different from prior statements to the DHHR workers that petitioner took the child upstairs to co-sleep.

During the interview with the evaluator, petitioner continued to claim that the child fell off of the bed and claimed that she lied to police about C.W. violently grabbing the child. She stated instead that she always handed the child to C.W. during their numerous arguments. When the examiner confronted petitioner about this inconsistent story, petitioner said that she lied to the police because she thought it would "sound bad" that she had been co-sleeping with the baby. Petitioner flatly denied all allegations of domestic violence. As petitioner denied all wrongdoing and professed that she lied to the police, the evaluator opined that petitioner's prognosis for improved parenting was guarded or poor.

Also in March of 2021, petitioner and C.W. attended a visit at the DHHR's office, and, according to the children's caretaker,[2] C.W. acted inappropriately by cussing at her when she refused to immediately hand the child over and instead took the child directly into the building. She stated that M.W. clung to her and would not let go, and that C.W. grabbed the caretaker's arm to try to pull M.W. off. The caretaker also reported that a prior visit with M.W. had been cut short because M.W. would not stop crying and hyperventilating until she was returned to the caretaker and foster mother. According to the visitation provider's report, he did not witness the altercation because he was outside waiting on C.W. to return to the car to carry items inside the building, but C.W. never returned. The provider stated that immediately after that visit, the parents complained that they wanted another provider, C.W. opened the car door while it was still moving, and then "stormed off" into the house. Petitioner and C.W. left their things in the provider's vehicle, forcing the provider to unload the car and set the items on the porch. The provider explained that when he tried to leave, petitioner's dog kept trying to get into the car. He took the dog to the porch and knocked on the door to get petitioner or C.W. to secure it. C.W. answered the door and started yelling at the dog, which scared it and caused it to run under the provider's car. When the provider pulled away, the dog emerged, and C.W. grabbed it and yelled at it while he went back inside the home.

In response to the visitation incident, the court appointed special advocate ("CASA") filed a report recommending that petitioner and C.W.'s visits cease. The report stated, "it gravely concerns this CASA that [C.W.] was trying to physically remove [M.W.] from someone's arms, given the unexplained broken leg that [she] suffered." The CASA worried that C.W. had repeated the actions that led to M.W.'s broken leg and that C.W.'s cussing at the caretaker and grabbing M.W. occurred in the other children's presence. The CASA also reported that L.R.'s behavior problems increased in severity surrounding days that she exercised visits. The CASA opined that petitioner was unable or unwilling to protect her children, and in light of petitioner's failure to acknowledge any wrongdoing, petitioner's improvement period should be terminated.

The court held a review hearing in mid-March of 2021, and reviewed petitioner and C.W.'s psychological evaluations, the DHHR's summaries, as well as the CASA report. The DHHR moved to terminate petitioner and C.W.'s improvement periods, while the guardian moved to suspend visitation only. The court held the motion to terminate improvement periods in abeyance but suspended all visitation.

---

[2]This individual is the daughter of the foster parent and often helps care for the children.

In May and June of 2021, the circuit court held an evidentiary hearing regarding the DHHR's motions to terminate petitioner and C.W.'s improvement periods. The children's caretaker testified consistently with her prior statements in the DHHR and CASA's reports. Next, a Child Protective Services worker testified that she was in the lobby of the DHHR building and witnessed the incident between C.W. and the caretaker. She corroborated the caretaker's testimony and stated that C.W. called the caretaker a "stupid f**king b**ch," yelled that M.W. was not her daughter, and yelled that the caretaker was being mean to him. She stated that C.W. was very angry and agitated and yelled at the caretaker in front of the children. C.W. testified that when he attempted to take M.W., the caretaker jerked the baby away. He denied cussing at the caretaker, yelling, or otherwise acting inappropriately. Petitioner testified that she did not hear C.W. yell or see him grab the child. The court concluded that "[t]he purpose of an improvement period is to show improvement, and honestly, I don't see any improvement here. I don't see any admission of any wrongdoing, and I feel that [petitioner] has been complacent" in regard to "very dangerous behavior toward the child." Accordingly, the court terminated C.W. and petitioner's improvement periods and set the matter for disposition.

The court held the final dispositional hearing in July of 2021. The ongoing DHHR worker testified that although petitioner substantially complied with services, she remained in a relationship with C.W., who clearly had anger management issues. She stated that petitioner continued to deny any wrongdoing despite being faced with expert medical testimony that M.W.'s broken leg was a nonaccidental injury. Petitioner testified and continued to deny that neither she nor C.W. deliberately hurt M.W. or had engaged in domestic violence. On cross-examination, petitioner denied telling the police officer that she left the room when M.W. fell off of the bed. A provider testified that both parents substantially complied with services. The CASA testified that she recommended termination of petitioner and C.W.'s parental rights considering the visitation incident, that L.R.'s behavioral problems greatly lessened after visitations were suspended, and that the parents continued to deny any wrongdoing. After hearing testimony, the circuit court noted that the matter concerned a very serious injury to an infant, that the parents continued to deny any wrongdoing despite evidence of M.W.'s nonaccidental injury, that C.W.'s behavior was very concerning in light of the unknown origin of M.W.'s broken leg, that petitioner was complacent in allowing C.W.'s behaviors to continue, and that the parents had not shown sufficient improvement to justify additional reunification services. The circuit court terminated petitioner and C.W.'s parental rights upon finding that there was no reasonable likelihood that they could correct the conditions of abuse and neglect in the near future and that termination was necessary for the children's welfare. Petitioner appeals the circuit court's August 25, 2021, dispositional order terminating her parental rights.[3]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the

---

[3]As C.W.'s parental rights were also terminated, the permanency plan for M.W. is adoption by a kinship placement. L.R. achieved permanency by remaining with her nonabusing father. The permanency plan for K.H. is placement with his nonabusing father.

evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in terminating her parental rights when she had substantially complied with the terms and conditions of her improvement period. According to petitioner, she passed all drug screens, enrolled in General Educational Development courses, completed domestic violence classes, and all reports regarding her performance and participation were positive. Petitioner argues that her improvement period was terminated based solely on the actions of C.W. and there was no evidence presented at the June of 2021 hearing to justify terminating her improvement period.

"At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child." Syl. Pt. 6, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

Syl. Pt. 3, *In re J.G.*, 240 W. Va. 194, 809 S.E.2d 453 (2018). Here, although petitioner participated in and completed many terms of her improvement period, she continued to deny any and all wrongdoing, including any domestic violence in the home or that she or C.W. caused the nonaccidental injury to M.W. We have held that

[i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Petitioner continued to deny the allegations of abuse and neglect despite expert medical testimony that M.W.'s broken leg was the result of nonaccidental injury. Petitioner continued to deny domestic violence in the home despite admitting to arguments with C.W. Additionally, DHHR workers, providers, and the children's caretakers witnessed C.W.'s inability to control his anger. Contrary to petitioner's contention that there was no evidence against her at the June of 2021 hearing, the circuit court found that petitioner, through her admitted psychological evaluation, continued to deny all wrongdoing and continued to be complacent toward C.W.'s violent, inappropriate, and

dangerous behaviors, as exhibited during a visitation at the DHHR headquarters. Because of petitioner's continued refusal to accept responsibility for the conditions that led to the filing of the instant petition—conditions that the DHHR worked to address through anger management, domestic violence classes, and parenting education classes—this Court agrees that continuing her improvement period would have been an "exercise in futility at the child[ren]'s expense." *Id.* Accordingly, we find no error in the circuit court's termination of petitioner's improvement period.

Likewise, we find no error in the circuit court's termination of petitioner's parental rights. As discussed above, neither parent took responsibility for the nonaccidental injury to M.W. We have held that

> "[p]arental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." Syllabus Point 3, *In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. Pt. 4, *In re Harley C.,* 203 W. Va. 594, 509 S.E.2d 875 (1998). Here, the record shows that petitioner's story of M.W.'s injury was fraught with inconsistences. Petitioner sometimes said she took the child upstairs to co-sleep and M.W. rolled out of the bed. Another time she stated she was out of the room when the child fell. Another time she stated that although she was asleep, she did not know that C.W. placed the child in bed with her, and she was surprised when she awoke to the baby crying on the floor. Yet another time, petitioner claimed that she, C.W., and M.W. were all sleeping together, but C.W. went downstairs to sleep on the couch. This differs from later statements that C.W. was always downstairs making dinner. Most importantly, the treating doctor and medical expert testified that the child's inner femur fracture would have been caused by a forceful grabbing or pulling on the leg—not a very short fall from the bed. Further, the doctor testified that M.W. was not yet mobile, thus questioning the child's ability to crawl across a bed and fall. The circuit court weighed the credibility of the doctor's testimony and that of petitioner against her prior inconsistent explanations and found petitioner incredible. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). The record establishes that petitioner failed to identify the perpetrator of M.W.'s abuse and, therefore, could not ensure that the abuse would not occur again in the future. Under these circumstances, there was sufficient support for the circuit court's determination that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future.

Insomuch as petitioner argues that she was entitled to a less restrictive dispositional alternative because the children were placed in a kinship home or with a parent, we have held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive

6

alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Based on the foregoing, it is clear that petitioner failed to remedy the conditions of abuse and neglect and, thus, termination of her parental rights was not in error.

For the foregoing reasons, we find no error in the decision of the circuit court, and its August 25, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: April 14, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment